Edward KASHISHIAN, Personal Representative of the Estate of Ruth Kashishian, Plaintiff-Appellant-Petitioner,

v.

Steven PORT, M.D., Issam Al-Bitar, M.D., and Mount Sinai Medical Center, Defendants-Respondents,†

WISCONSIN HEALTH CARE LIABILITY INSURANCE PLAN and Wisconsin Patients Compensation Fund, Defendants.

Supreme Court

*No. 89-2039. Oral argument October 29, 1991.—Decided March 18, 1992.*

(Also reported in 481 N.W.2d 277.)

†Motion for reconsideration denied on May 6, 1992.

For the plaintiff-appellant-petitioner there were briefs (in the court of appeals) *Sean N. Duffey, Penelope D. Hillemann, Richard H. Schulz* and *Law Offices of*

■

*Richard H. Schulz,* Milwaukee, and oral argument by *Mr. Duffey.*

For the defendant-respondent, Steven Port, M.D., the cause was argued by *David T. Flanagan,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

For the defendants-respondents, Issam Al-Bitar, M.D. and Mount Sinai Medical Center, there were briefs by *Michael P. Malone, Thomas A. Ogorchock* and *Hinshaw & Culbertson,* Milwaukee and oral argument by *Mr. Ogorchock.*

WILLIAM A. BABLITCH, J. The plaintiff, Edward Kashishian (Kashishian), personal representative of the estate of Ruth Kashishian, seeks review of an unpublished decision of the court of appeals which dismissed, in part, Kashishian's medical malpractice action against Mount Sinai Medical Center (Mount Sinai) and in full his action against Dr. Steven Port. Kashishian first argues that Mount Sinai is liable for the allegedly negligent acts of Dr. Port because Dr. Port was an actual agent of Mount Sinai. We conclude that as a matter of law Dr. Port was not an actual agent of Mount Sinai, and therefore summary judgment as to this issue was appropriate.

The next issue presented, which is the primary issue, is whether Mount Sinai can be held vicariously liable, under the doctrine of apparent authority, for the allegedly negligent acts of Dr. Port who treated Ms. Kashishian at Mount Sinai. More broadly stated, the issue is whether hospitals can be held liable under the doctrine of apparent authority for the negligence of hospital doctors whose relationships with the hospital are those of independent contractors, and not those of employee/servants. We conclude, for the reasons listed

28

below, that the doctrine of apparent authority can be a basis for a malpractice action against a hospital beyond the emergency room context in instances in which the elements necessary to prove apparent authority exist. We further conclude that an issue of material fact exists as to whether Dr. Port was the apparent agent of Mount Sinai, and therefore summary judgment as to this issue was inappropriate.

The third and final issue presented is whether Kashishian was required to file with the state a notice of claim pursuant to statute because of Dr. Port's status as a state employee. We conclude that such notice was required, and since Kashishian failed to file the notice of claim within the statutory period, Dr. Port was appropriately dismissed from the action. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

Because this case comes to us following motions for summary judgment, the facts before us on review are limited. Ruth Kashishian entered Mount Sinai on April 2, 1986. Her attending physician was Dr. Hugh Davis. It is unclear from the record whether Ms. Kashishian entered the hospital to obtain a cardiac consultation regarding the proper treatment of her condition, whether she was admitted to receive care from her attending physician Dr. Davis, or both. At oral argument, Mr. Kashishian's attorney stated that Dr. Davis admitted Ms. Kashishian to Mount Sinai in order to receive a cardiac evaluation. It is also unclear from the record why Ms. Kashishian chose Mount Sinai as the hospital in which to receive her care.

Dr. Port's care of Ms. Kashishian began with an April 3, 1986, cardiology consultation. Dr. Hugh Davis requested the consultation. Kashishian contends that it is unclear from the record whether Dr. Davis' request

29

was made to Mount Sinai's cardiology department or specifically to Dr. Steven Port. Dr. Port and Mount Sinai maintain that the record is clear that Dr. Davis' request was made specifically to Dr. Port. At the time of the requested consultation, Dr. Port was the Director of Nuclear Cardiology within the Cardiovascular Disease Section of the Milwaukee Clinical Campus located at Mount Sinai.

On April 4, 1986, a pericardiocentesis was performed upon Ms. Kashishian. The deposition of Dr. Port indicates that the decision to perform the pericardiocentesis was made after Ms. Kashishian's admission to the hospital. The cardiac catheterization report, which details the events that occurred during the pericardiocentesis procedure, identifies the physician as Steven Port, M.D. The report was signed by both Dr. Port and Dr. Al-Bitar. The "consent to operation or other procedures" signed by Ms. Kashishian before the operation indicates that both doctors would be performing the procedure. Thus, the record is ambiguous as to who actually performed the procedure—whether it was performed by Dr. Port, Dr. Al-Bitar or by both physicians acting together.

During the surgery, air was injected into Ms. Kashishian's heart. Ms. Kashishian suffered significant brain damage during the procedure. She died 75 days later on June 18, 1986. The complication occurring during the pericardiocentesis is the basis for Mr. Kashishian's medical malpractice lawsuit.

At the time he performed the pericardiocentesis, Dr. Port was employed by the University Physicians Milwaukee Clinical Campus Practice Plan, Inc. (MPP), which was in turn run by the University of Wisconsin Medical School. Dr. Port's position required him to be both a faculty member at the University of Wisconsin

Medical School and to participate in the school's clinical program as Director of Nuclear Cardiology within the Cardiovascular Disease Section at Mount Sinai. The University of Wisconsin Medical School's Milwaukee Clinical Campus has been located at Mount Sinai since 1974 in accordance with affiliation agreements between the University of Wisconsin and Mount Sinai Medical Center, Inc. Pursuant to these agreements the University of Wisconsin School of Medicine's faculty and support personnel were to provide clinical, administrative and teaching services to the Milwaukee Clinical Campus located at Mount Sinai.

Sometime prior to June 17, 1987, Kashishian's counsel reviewed Ms. Kashishian's medical records, and on June 17, 1987, counsel wrote a letter to Drs. Port and Al-Bitar alleging their negligence in performing the pericardiocentesis. Kashishian asked that the doctors refer the letter to their liability insurance carriers. In a July 27, 1987, reply to the letter, an assistant attorney general, on behalf of Dr. Port, stated that Dr. Port was:

> at all times material, a full-time member of the faculty of the University of Wisconsin Medical School, Milwaukee Clinic Campus. Any participation by Dr. Port in providing medical care to your client was undertaken as part of his faculty duties and this office will therefore defend Dr. Port in any legal proceeding that may result.

On June 22, 1988, Kashishian served a notice of claim upon the Attorney General of Wisconsin alleging that Dr. Port had, by negligent action, caused injury to Ruth Kashishian on April 4, 1986. This lawsuit was commenced on July 22, 1988.

Both Dr. Port and Kashishian moved for summary judgment. Dr. Port's motion, based on his alleged status

as an employee of the state, claimed that Kashishian failed to timely file a notice of claim pursuant to sec. 893.82, Stats. 1983–84. Kashishian moved for a partial summary judgment seeking a declaration that, as a matter of law, Dr. Port had been acting as the actual or apparent agent of Mount Sinai when he treated Ruth Kashishian.

The circuit court ruled that as matter of law Dr. Port was an employee of the University of Wisconsin system and not an actual agent of Mount Sinai pursuant to a letter agreement between Dr. Port and the University of Wisconsin dated January 22, 1985. The court further held that since Dr. Port was a state employee, Kashishian was required to file a notice of claim with the state of Wisconsin pursuant to sec. 893.82, Stats. Because a notice was not timely filed, the circuit court dismissed the action against Dr. Port. The circuit court also ruled that Dr. Port could not be the apparent agent of Mount Sinai without enlarging the parameters of the doctrine of apparent authority in Wisconsin. The circuit court therefore denied Kashishian's motion for summary judgment and granted summary judgment in favor of Mount Sinai.

The court of appeals affirmed the decision of the circuit court in all respects.

When reviewing a grant or denial of a motion for summary judgment, we apply the standards set forth under sec. 802.08(2), Stats., which provides that the judgment sought shall be rendered only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

## I.

We first address the issue of respondeat superior: whether Dr. Port was acting as the actual agent of Mount Sinai at the time of the alleged malpractice. Kashishian does not dispute that Dr. Port was an employee/servant of the University Physicians Milwaukee Clinical Campus Practice Plan, Inc. at the time of Ruth Kashishian's injuries. Rather, he argues that Dr. Port was at the same time an employee/servant of Mount Sinai. We disagree.

■

Under the doctrine of respondeat superior, an employer is responsible to third parties for the negligent conduct of its servants. *Arsand v. City of Franklin,* 83 Wis. 2d 40, 45, 264 N.W.2d 579 (1978). " 'A servant is one employed to perform a service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right of control.' " *Arsand,* 83 Wis. 2d at 45–46 (quoting *Heims v. Hanke,* 5 Wis. 2d 465, 468, 93 N.W.2d 455 (1958) *overruled on other grounds by Butzow v. Wausau Memorial Hospital,* 51 Wis. 2d 281 (1971)) (emphasis omitted).

> The right to control is the dominant test in determining whether an individual is a servant. However, other factors are considered, including the place of work, the time of the employment, the method of payment, the nature of the business or occupation, which party furnishes the instrumentalities or tools, the intent of the parties to the contract, and the right of summary discharge of employees. *Pamperin v. Trinity Memorial,* 144 Wis. 2d 188, 199, 423 N.W.2d 848 (1988).

Here, it is abundantly clear that Dr. Port was not a servant of Mount Sinai at the time of the alleged malpractice, but rather an independent contractor.

With respect to the element of control, Mount Sinai did not exercise control over the manner in which Dr. Port's cardiological services were provided. In *Pamperin,* 144 Wis. 2d at 200, this court, in discussing the control a hospital exerted over a radiologist, noted that "[t]he very nature of a radiologist's function requires the exercise of independent professional judgment. Accordingly, a hospital is not in a position to, and generally does not, exercise control over a radiologist's performance of his or her professional activities." This is equally true in the context of a cardiologist. Mount Sinai may have required that physicians supplied by MPP be members of Mount Sinai's staff, and required the physicians to comply with the policies, by-laws, rules, and regulations of Mount Sinai. That does not indicate that a master-servant relationship existed anymore than it did in *Pamperin. See Pamperin,* 144 Wis. 2d at 201. Mount Sinai did not reserve control and there are no facts alleged to indicate that they had the right of control over the discretion and specific professional techniques in performing medical procedures employed by Dr. Port.

Other factors also indicate that Dr. Port was not Mount Sinai's servant at the time of the alleged malpractice. Dr. Port's paycheck came from the Milwaukee Practice Plan, a corporate entity controlled by the University. Richard E. Reiselbach, M.D., the Associate Dean of the University of Wisconsin Medical School, stated in an affidavit that at the time of Ms. Kashishian's injury he held the direct responsibility to supervise the activities of the University faculty at the Milwaukee Clinical Campus. He further indicated that all final decisions on appointments and reappointments

of faculty to the Clinical Campus were made by the Dean of the University Medical School. Finally, the amount of compensation paid to each member of the University faculty at the Clinical Campus was determined by the Dean of the University.

Kashishian's argument for dual status relies primarily upon a letter dated January 19, 1982, which describes Dr. Port's employment. The letter reads:

> [w]e would anticipate your joining the University of Wisconsin Medical School faculty of the Milwaukee Clinical Campus, which is located at the Mount Sinai Medical Center, as of April 1, 1982. You would hold the academic rank of Assistant Professor of Medicine (MCC) on the collateral faculty. Your initial faculty appointment would be for a period of three years . . ..

This letter also states that any renewal of Dr. Port's faculty appointment was subject to departmental and medical school review procedures. The other relevant portion of this letter reads: "Your Medical School appointment will be coterminous with the Mount Sinai Affiliation and/or your active employment as a full-time faculty member at the Mount Sinai Medical Center of Milwaukee. The Medical School will bear no financial responsibility for your salary or fringe benefits." Kashishian's reliance on this letter as determinative of the "actual agency" issue is misplaced. As the court of appeals noted, this letter may have been Dr. Port's contract in 1982, but it was subsequently modified by a letter dated January 23, 1985. This letter, quoted below[1]

---

[1]Dr. Port's modified employment contract dated January 22, 1985 informed Dr. Port that:

Effective January 1, 1985, all full-time faculty of the University of Wisconsin Medical School Milwaukee Clinical Campus are required,

35

made Dr. Port an employee of MPP, and offers no support for a finding of a master/servant relationship between Mount Sinai and Dr. Port.

The other factors offered by Kashishian—Mount Sinai's power to review appointments and the requirement that the faculty appointees be members of Mount Sinai's staff—do not compel the conclusion that Dr. Port was Mount Sinai's servant. As we indicated in *Pamperin*, these factors have mainly a "focus on maintaining professional standards; they do not indicate that a master-servant relationship exists." 144 Wis. 2d at 201. The limited control which Mount Sinai had over Dr. Port did not transform their relationship into a master-servant relationship. Rather, Dr. Port was an indepen-

as a condition of their faculty appointments, to participate in the University of Wisconsin Milwaukee Clinical Practice Plan. . . .

The purposes of the Clinical Practice Plan are, within the scope of the Affiliation Agreement between Mount Sinai Medical Center and the University of Wisconsin Medical School, to provide the terms and conditions upon which the Milwaukee Clinical Campus Faculty may perform compensated professional services.

. . .

To participate in the Clinical Practice Plan, you must become an employee of University Physicians Milwaukee Clinical Practice Plan, Inc. (MPP). This letter is your formal letter of employment with MPP. . . . While acting within the scope of your faculty appointment you will be considered an agent of the University of Wisconsin System within the meaning of § 895.46 *Wis. Stats.*, as you are at present.

The letter goes on to state that:

Although your duties and responsibilities, your compensation and other matters relating to your service as a faculty member are essentially unchanged from what they have been, your employment by MPP does represent a modification of your letter of appointment to the faculty. It is necessary that we have your written agreement to this modification and your acceptance of employment by MPP.

dent contractor at the time of Ruth Kashishian's injury. Accordingly, we conclude that the doctrine of respondeat superior is not applicable in this case.

## II.

We now turn to the issue of whether Mount Sinai can be held liable for Dr. Port's acts under the doctrine of apparent authority. Kashishian argues that the applicability of the doctrine of apparent authority to the hospital/independent physician context, as set forth by this court in *Pamperin,* 144 Wis. 2d 188, should not be limited solely to facts involving treatment in a hospital emergency room or limited to facts involving patients who enter the hospital without a personal attending physician. Kashishian points out that this court in *Pamperin,* although expressly limiting its decision to the emergency room, noted it was not addressing the doctrine with respect to other types of hospital-patient relationships. He therefore suggests that *Pamperin* did not foreclose the future application of apparent authority to other factual contexts.

Mount Sinai and Dr. Port claim that the *Pamperin* decision is expressly limited to the emergency room fact situation and should not be expanded. According to Mount Sinai and Dr. Port, the doctrine of apparent authority does not apply when a patient is admitted by her own personal attending physician and then receives services at the hospital. We disagree. We conclude, for the reasons listed below, that the doctrine of apparent authority can be a basis for a malpractice action against a hospital beyond the emergency room context in instances in which the elements necessary to prove apparent authority exist.

37

The development in the law of the doctrine of apparent authority is based on a number of supporting rationales. Cases and commentaries on the doctrine invariably point to the recognition that hospitals increasingly hold themselves out to the public in expensive advertising campaigns as offering and rendering quality health care services. One need only pick up a daily newspaper to see full and half page advertisements extolling the medical virtues of an individual hospital and the quality health care that the hospital is prepared to deliver in any number of medical areas. Modern hospitals have spent billions of dollars marketing themselves, nurturing the image with the consuming public that they are full-care modern health facilities.[2] All of these expenditures have but one purpose: to persuade those in need of medical services to obtain those services at a specific hospital. In essence, hospitals have become big business, competing with each other for health care dollars. As the role of the modern hospital has evolved, and as the image of the modern hospital has evolved (much of it self-induced), so too has the law with respect to the hospital's responsibility and liability towards those it successfully beckons. Hospitals not only employ physicians, surgeons, nurses, and other health care work-

---

[2] United States hospitals spent $1.54 billion on advertising and marketing of their services in 1989, an average of $320,717 per hospital (an increase of 15 percent over 1988). Advertising consumed $687 million of this total, an average of $142,975 per hospital. . . . Of 1988 marketing expenditures of hospitals responding to the survey, 55.3 percent was spent to reach consumers, 8.9 percent to reach businesses and 20.7 percent to reach physicians. . . . These expenditures seem to be effective: more than 50 percent of consumers nationwide recall seeing or hearing a hospital advertisement. Steven R. Owens, Comment, *Pamperin v. Trinity Memorial Hospital* and the Evolution of Hospital Liability: Wisconsin Adopts Apparent Agency, 1990 Wis. L. Rev. 1129 n.1 (1990) (citations omitted).

ers, they also appoint physicians and surgeons to their hospital staffs as independent contractors. What is the responsibility of hospitals when these independent contractors render negligent health care? Can they escape liability for the rendering of negligent health care in all instances simply because the person rendering the care was an independent contractor, regardless of how hospitals held themselves out to the consuming public, regardless of how the doctor rendering the health care held himself or herself out to the consuming public, and regardless of the perception created in the mind of the consuming public? We think not.

In *Pamperin*, this court for the first time applied the doctrine of apparent authority to impose liability on a hospital, in an emergency room context, for the negligence of hospital physicians who were independent contractors. "Under apparent authority, a principal may be held liable for the acts of one who reasonably appears to a third person, through acts by the principal or acts by the agent if the principal had knowledge of those acts and acquiesced to them, to be authorized to act as an agent for the principal." *Pamperin*, 144 Wis. 2d at 203.

Specifically with respect to the potential liability of hospitals under the doctrine of apparent authority, we held that liability exists if the following three elements are present:

> (1) the hospital, or its agent, acted in a manner which would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the

39

hospital or its agent, consistent with ordinary care and prudence. *Pamperin,* 144 Wis. 2d at 208.

In using the term "agent," we were referring to the individual who was alleged to be negligent. We limited our decision in *Pamperin* to the emergency room context because those were the facts presented. However, we specifically left open the question of a hospital's liability for its services in a situation where the patient enters the hospital with a personal attending physician. *See Pamperin* 144 Wis. 2d at 193. We are now presented with facts beyond the emergency room context to another context involving an independent contractor, and we must determine if our holding in *Pamperin* should be expanded.

As we recognized in *Pamperin,* a large number of other jurisdictions have been willing to apply the doctrine of apparent authority to the hospital/independent physician context. E.g., *Paintsville Hospital v. Rose,* 683 S.W.2d 255 (Ky. 1985); *Arthur v. St. Peters Hospital,* 405 A.2d 443 (N.J. 1979); *Grewe v. Mt. Clemens General Hospital,* 273 N.W.2d 429 (1978). The courts noted in *Pamperin* are only a few that have joined the growing trend in applying apparent authority to the hospital/ independent physician context. *See also Jackson v. Power,* 743 P.2d 1376 (Alaska 1987); *Stanhope v. Los Angeles College of Chiropractic,* 128 P.2d 705 (Cal. App. 1942); *Richmond County Hosp. Authority v. Brown,* 361 S.E.2d 164 (Ga. 1987); *Mehlman v. Powell,* 378 A.2d 1121 (Md. 1977); *Hardy v. Brantley,* 471 So. 2d 358 (Miss. 1985); *Themins v. Emanuel Lutheran Charity Bd.,* 637 P.2d 155, (Or. App. 1982); *Shephard v. Sisters of Providence Oregon,* 750 P.2d 500 (Or. App. 1988); *Albain v. Flower Hosp.,* 50 Ohio St. 3d 251, 553 N.E.2d 1038 (Ohio 1990); *Whitaker v. Zirkle,* 374 S.E.2d 106 (Ga. App. 1988). This nationwide acceptance of the

application of the doctrine of apparent authority in the hospital context has been described by one commentator as follows:

> [i]t appears inevitable that the doctrine will be fully embraced by the courts in view of the steady expansion of hospital liability and the acceptance of the ostensible agency theory by a majority of the jurisdictions considering the issue . . .. [O]stensible agency has not taken hold in some jurisdictions only because no case has yet been presented with sufficient factual grounds to support application of the doctrine. Thus, to date plaintiffs have failed more often because of problems of evidence rather than problems of law. G. Keith Phoenix and Anne L. Schlueter, Hospital Liability For the Acts of Independent Contractors: The Ostensible Agency Doctrine, 30 St. Louis U. L.J. 875, 885 (1986).

We noted in *Pamperin* that there are a number of rationales and policy considerations that support this development in the law. For example, hospitals no longer merely provide the facilities where physicians practice, but rather, hospitals offer a variety of health care services. *Pamperin,* 144 Wis. 2d at 204. As one commentator noted, "[t]oday's hospitals are larger and more complex than ever before and operate as highly integrated systems utilizing a team approach to medical care." Note, Theories For Imposing Liability Upon Hospitals For Medical Malpractice: Ostensible Agency and Corporate Liability, Wm. Mitchell L. Rev. 561 (1985) (footnotes omitted). Furthermore, hospitals increasingly hold themselves out as offering and rendering quality health care and patients frequently look to the hospital, not a particular physician, for their care and treatment. *Pamperin* 144 Wis. 2d 204. As one court described:

41

There may have been a time when all the world knew hospitals were mere structures where physicians treated and cared for their patients. In such a society one would be hard pressed to show that he justifiably relied on the hospital to care for his illness or injury through doctors employed for that purpose. But the situation has evolved. Most modern hospitals hold themselves out to the public as providing many health related services including services of physicians. A patient is likely to look to the hospital, not just to a particular doctor he comes into contact with through the hospital. *Richmond County Hospital Authority v. Brown,* 361 S.E.2d 164, 166 (Ga. 1987).

With respect to emergency care, this rationale is strengthened by the awareness that patients often seek emergency care and treatment from a hospital, in reliance on the hospital, and are unaware of the status of the various professionals in the emergency room. However, courts applying the apparent authority doctrine in other jurisdictions have not limited its application to emergency rooms. *See, e.g., Doctors Hosp. of Augusta v. Bonner,* 392 S.E.2d 897 (Ga. App. 1990); *Sharsmith v. Hill,* 764 P.2d 667 (Wyo. 1988); *Sztorc v. Northwest Hosp.,* 496 N.E.2d 1200 (Ill. App. 1 Dist. 1986). Implicit in these opinions is a recognition that the existence of apparent authority is a question for the trier of fact and should apply where the circumstances establish apparent authority. They also recognize that the rationales and policies supporting the application of the apparent agency doctrine in the emergency room setting apply equally in other areas of the hospital—when the elements necessary to establish apparent authority are present. We agree with this authority. Furthermore, we are not persuaded by Mount Sinai and Dr. Port's argument that, although perhaps not limited to the emergency room, the doctrine of apparent authority does not apply

42

when a patient is admitted to the hospital by his/her personal attending physician and then receives the services of the hospital. As one court discussing this issue has noted:

> The relevant relationship in this case is between the hospital and Temply, [the surgical independent contractor resident] not between it and any private physician with whom the plaintiff contracted. The fact that plaintiff contracted with a private physician as her primary surgeon is not, as a matter of law, inconsistent with hospital's having clothed Temply [the independent contractor physician] with ostensible authority to act as its agent in assisting the private doctors. *Shephard v. Sisters of Providence*, 750 P.2d 500, 505 (Or. App. 1988).

We agree. Nor is the plaintiff's contact with a private personal physician necessarily inconsistent with the hospital having held out specialists and/or consultants as its apparent agents.

Commentators on the doctrine of apparent authority have also noted that the doctrine of apparent authority has not been applied solely in the emergency room context. *See, e.g.,* G. Keith Phoenix and Anne L. Schlueter, Hospital Liability For the Acts of Independent Contractors: The Ostensible Agency Doctrine, 30 St. Louis U. L.J. 875, 879 (1986) (footnotes omitted) ("[h]istorically, cases imposing liability based on the ostensible agency theory involved either treatment in the emergency room or treatment or tests provided in hospital-based departments such as radiology."). *See also,* Steven R. Owens, *Pamperin v. Trinity Memorial Hospital* and the Evolution of Hospital Liability: Wisconsin Adopts Apparent Agency, 1990 Wis. L. Rev. 1130 and accompanying note (1990) (noting that although

*Pamperin* only addressed the emergency room context, the doctrine of apparent authority likely affects non-emergency room contexts). We agree with other jurisdictions and commentary on this issue and hold that the doctrine of apparent authority is not limited to the emergency room context. Nor is it limited to situations where a patient enters the hospital without a personal attending physician. We conclude that the doctrine of apparent authority applies to any factual situation in which the elements necessary to prove apparent authority exist: (1) the hospital, or the individual alleged to be negligent, acted in a manner which would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the individual alleged to be negligent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or the individual alleged to be negligent, consistent with ordinary care and prudence.

In *Pamperin,* we listed these three criteria for the existence of apparent authority, and found that these three criteria can be satisfied in a hospital emergency room setting. We can discern no reason to conclude, as a matter of law, that the doctrine of apparent authority should not exist in other contexts concerning hospitals and independent physicians when all the elements are present or when a question of material fact exists as to the elements. We so hold.

Mount Sinai and Dr. Port argue that to extend the doctrine of apparent authority to cover factual situations such as presented here would be contrary to our statement in *Pamperin* in which we said:

[t]he rule we adopt today applies only where the patient looks to the hospital as the provider of health care, and the hospital selects the physicians and its staff. Where a patient seeks care from a physician who then uses the hospital facilities, the hospital would not be liable under the doctrine of apparent authority. 144 Wis. 2d at 208.

They also point to our language that as to the element of reliance, the plaintiffs must show that they are seeking care from the hospital and not merely looking to the hospital "as a place for his or her personal physician to provide medical care." *Id.* at 212. However, nothing about our holding today undermines these statements. They apply with equal force to a plaintiff's claim of apparent authority in a non-emergency room context. In other words, had Dr. Davis who admitted her to Mount Sinai been the negligent party, and assuming that the elements outlined above were not existent, the hospital would not be liable for his negligence under the doctrine of apparent authority.

Contrary to the assertion of Mount Sinai and Dr. Port, the holding we set forth today represents good public policy. We agree with the many courts and commentators who have set forth the numerous reasons why applying the doctrine of apparent authority to hold hospitals liable under apparent authority is sound public policy. As one author has noted:

holding a hospital liable for a physician's negligent acts provides a stronger incentive to the hospital to monitor and control physicians. This will result in higher quality medical care since the hospital is in the best position to enforce strict adherence to policies regarding patient safety, whether it be by rules, regulations, or other means. Second, . . . [holding the hospital liable] places the burden of liability on a

financially dependable defendant so that an injured patient may receive adequate compensation. Note, Medical Malpractice—Ostensible Agency and Corporate Negligence—Hospital Liability May Be Based On Either Doctrine of Ostensible Agency or Doctrine of Corporate Negligence, 17 St. Mary's L. J. 551, 573 (1986) (footnotes omitted).

Additionally, another commentary has posited that:

reasons once asserted for exempting hospitals from liability for the acts of physicians who were independent contractors are now outweighed by stronger public policy. . . .

. . ..

Since modern hospitals are run like businesses, it is reasonable to require them to insure against malpractice by all their personnel, including doctors. Payment of insurance premiums by hospitals can be negotiated along with other terms of employment and can be absorbed as a cost of doing business. If hospitals become more directly involved in malpractice liability, they will undoubtedly develop a greater interest in monitoring the quality of care being provided. Note, Theories For Imposing Liability Upon Hospitals For Medical Malpractice: Ostensible Agency and Corporate Liability, 11 Wm. Mitchell L. Rev. 561, 581–583 (1985) (footnotes omitted).

An author discussing our decision in *Pamperin* also set forth a cogent analysis in support of the application of apparent authority to the hospital/physician context. He stated:

Once the doctrine of apparent agency is firmly in place, it provides powerful incentives for the hospital to ensure high quality health care. When the hospital incurred no liability for the actions of its indepen-

dent-contractor physicians, it had little financial incentive to ensure that those physicians were more than minimally competent and had more than minimal resources at their disposal. With the doctrine of apparent agency in place, the hospital will be held financially responsible, as if it had full control over the independent contractor. This should prompt cost-conscious hospital administrators to do what they can to ensure quality care and the absolute minimum of malpractice awards. Note, *Pamperin v. Trinity Memorial Hospital* and the Evolution of Hospital Liability: Wisconsin Adopts Apparent Agency, 1990 Wis. L. Rev. 1127, 1151 (1990) (footnotes omitted).

Finally, Professor Southwick in an article in the Journal of Legal Medicine suggests that:

[I]t is time for the hospital, all of its employees, and all physicians admitted to membership on the medical staff to be insured by the same insurance carrier . . . to reduce the costs and the excessive length of the litigation process . . .. In the long run [not doing so] is unproductive and very costly to the health care industry. In turn, it is costly to patients. Southwick, Hospital Liability—Two Theories Have Been Merged, 4 J. Legal Med. 1, 49 (1983).

For the reasons set forth above we conclude that the doctrine of apparent authority can be a basis for a medical malpractice action against a hospital for the negligent acts of independent contractors under any factual situation in which the elements necessary to prove apparent authority exist.

Having concluded that the doctrine of apparent authority extends beyond the emergency room setting, we now must determine whether summary judgment was appropriately granted with respect to this issue. We con-

47

clude an issue of material fact exists as to whether Dr. Port was the apparent agent of Mount Sinai.

In Dr. Port's deposition, when asked about the request for the cardiac consultation he states that "*[w]e were asked to evaluate her for the possibility of doing a pericardiocentesis.*" (Emphasis added.) Furthermore, the Cardiac Consultation Record states that Ruth Kashishian was "referred to us" for evaluation, that "we believe" the patient is in no impending danger, and that "our plans are" institution of tetracycline in the pericardial sac. One could draw the reasonable inference from this document that it was the cardiology department, or Dr. Port as a member of that department, that was consulted.

Additionally, the consultation record and the "consent to procedures" form found in the record are both printed on Mount Sinai letterhead. The consent form signed by Ms. Kashishian did not identify Dr. Port as an employee of the University of Wisconsin, although in contrast it said he might be assisted by Medical Students from the University of Wisconsin. The consultation record begins with the phrase "Consulting Service: Cardiology."

Lastly, Kashishian submitted an affidavit with attached advertisements that indicate that shortly before Ms. Kashishian entered Mount Sinai Medical Center, the hospital was advertising itself as providing quality health care in specialized areas of medicine, including cardiology. One advertisement stated "[Mount Sinai] [has] an international reputation for excellence in cardiovascular medicine. In fact there's only a handful of hospitals in the country that can come up to our comprehensive capabilities and our record."

From the above, we find that a trier of fact could reasonably believe that Dr. Port was acting under the apparent authority of Mount Sinai. A contrary conclusion is also possible. Accordingly, we reverse the court of appeals determination that as a matter of law Dr. Port was not the apparent agent of Mount Sinai and hold that since a dispute of material fact exists, the question of apparent authority in this case is one for the trier of fact.

## III.

We turn now to the issue of whether Mr. Kashishian's failure to timely file a notice of claim with the state pursuant to statute mandated dismissal of Dr. Port from Mr. Kashishian's medical malpractice action. We hold that it does.

Section 893.82 (3), Stats. 1983–1984, states that:

> No civil action or civil proceeding may be brought against any state officer, employe or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employe's or agent's duties, unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim . . ..

Kashishian argues that he may maintain a suit against Dr. Port irrespective of the fact that he did not comply with the notice provisions for one of these three reasons; either: (1) Dr. Port was serving a dual capacity and may be sued as an actual agent of Mount Sinai instead of in his capacity as a state employee; or (2) Dr. Port was serving a dual capacity and may be sued as an apparent agent of Mount Sinai; or (3) because applying the notice

requirements to Kashishian under the facts of this case would deny petitioner his right to due process. We disagree with all three.

Acceptance of Kashishian's first argument requires a finding that Dr. Port was an actual agent of Mount Sinai. We concluded in Part I of this opinion that Dr. Port was not an actual agent of Mount Sinai. Therefore, Kashishian's first argument is without merit.

Likewise, a possible finding that Dr. Port was acting as the apparent agent of Mount Sinai does not permit Kashishian to maintain this suit against Dr. Port absent satisfaction of the notice requirements. The doctrine of apparent authority holds a principal liable for the acts of its agents. The doctrine's application in this case, should it apply, does not change Dr. Port's status as a state employee, does not change the fact that in treating Ms. Kashishian Dr. Port was acting within the scope of his state employment, and does not negate the notice requirements.

Relying on the Restatement of the Law of Agency (2d), Sections 217B and 359C, Kashishian suggests that a court may not hold a principal liable for the negligent acts of an agent and at the same time dismiss the agent from the action. However, Kashishian's reliance on the Restatement for this assertion is misplaced. The Restatement provides that "[i]f the action is based solely upon the tortious conduct of the agent, judgments on the merits for the agent and against the principal, or judgments of varying amounts for compensatory damages are erroneous." This simply means that a principal cannot be held liable for the acts of the agent if the agent's acts were adjudged not negligent. In this case, Dr Port's negligence is not being determined. He is being dismissed from the action for a failure to file a timely notice of claim. Such a dismissal is appropriate despite the fact

that the suit may be maintained against Mount Sinai. *See Pamperin,* 144 Wis. 2d at 215 (Steinmetz, J., dissenting) (noting that the statute of limitations had run against the negligent doctors and they could not be joined as defendants. The majority in Pamperin, however, allowed the plaintiffs to proceed with their lawsuit against the hospital).

Lastly, Kashishian claims that he neither knew nor should have known prior to the expiration of the 120-day period established by sec. 893.82., Stats., that Dr. Port was a state employee. Therefore, he asserts that barring this action because the 120-day period expired before notice under sec. 893.82 was given would violate his due process rights. We disagree.

■

In this case, the alleged negligently caused injury to Ms. Kashishian took place on April 4, 1986. She died on June 18, 1986. On July 27, 1987, the Attorney General wrote the petitioner and informed him that since the respondent, Dr. Port was a University of Wisconsin employee, the state's attorney general would defend Dr. Port in the action. Yet it was not until June 22, 1988 that Kashishian filed his notice of claim to the attorney general. As Dr. Port points out, Kashishian was well aware of Dr. Port's identity and role in the alleged negligence at the latest on July 27, 1987, but the notice of claim was not filed until June 22, 1988—approximately 330 days after counsel had actual knowledge and numerous days after the date counsel was actively investigating the claim by requesting consent to review Ms. Kashishian's medical records. Thus, we need not determine if knowledge of Dr. Port's status as a state employee is required for enforcement of the notice of claim statute, as Kashishian did not comply with the statutory time limits even if the 120-day period began

running on the date that he had actual notice. For the reasons set forth above we conclude that Kashishian's failure to file a timely notice of claim pursuant to statute mandates summary judgment dismissing Dr. Port from this action.

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and cause remanded for further proceedings consistent with this opinion.

STEINMETZ, J. *(concurring).* I dissented in *Pamperin v. Trinity Memorial,* 144 Wis. 2d 188, 423 N.W.2d 848 (1988), because the court over-extended the doctrine of apparent authority to a radiologist who was an independent contractor. In *Pamperin,* the plaintiff was unaware of the radiologist's relationship with the hospital or that he even existed, and was unaware that the radiologist would be reading x-rays and giving an opinion to the hospital concerning the plaintiff's condition.

In contrast, in the present case, the patient was fully aware of the doctor's involvement in her treatment. Dr. Steven Port consulted with Ms. Kashishian and alerted her of his decisions concerning her surgery and other health care matters. Moreover, Ms. Kashishian signed a consent form before the operation acknowledging that Dr. Port was one of the doctors performing the procedure. Because Ms. Kashishian had knowledge of the doctor's involvement in her care, this court has properly decided that an issue of material fact exists as to whether Dr. Port was the apparent agent of Mount Sinai.