# Illinois Official Reports

## Appellate Court

---

### *Harris v. Symphony Countryside, LLC*, 2019 IL App (1st) 180160

---

| | |
|---|---|
| Appellate Court Caption | WILLIAM HARRIS, as Special Administrator of the Estate of Lillie Michelet, Deceased, Plaintiff-Appellant, v. SYMPHONY COUNTRYSIDE, LLC, d/b/a Symphony of Orchard Valley; COUNTRYSIDE CARE CENTRE, INC.; COUNTRYSIDE CARE, LLC; and PRESENCE CENTRAL AND SUBURBAN HOSPITALS NETWORK, d/b/a Presence Mercy Medical Center, Defendants (Countryside Care Centre, Inc., and Countryside Care, LLC, Defendants-Appellees). |
| District & No. | First District, Second Division<br>Docket No. 1-18-0160 |
| Filed | March 19, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-6058; the Hon. Patricia O'Brien Sheahan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John F. Winters, of Winters Salzetta O'Brien & Richardson, LLC, of Chicago, for appellant.<br><br>Richard M. Jacobson, of Ashman & Stern, P.C., of Skokie, for appellees. |

PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Pucinski and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1 Lillie Michelet was admitted to the Countryside Care Centre nursing home on April 21, 2014. She was discharged on June 21 with bedsores on various parts of her body, which allegedly caused sepsis and led to her death on June 29. Her son, William Harris, as special administrator of her estate, brought suit against various entities, including Countryside Care Centre, Inc., and Countryside Care, LLC (collectively, Countryside defendants), alleging negligence and violations of the Nursing Home Care Act (210 ILCS 45/1-101 *et seq.* (West 2014)).

¶ 2 The trial court granted summary judgment to the Countryside defendants because they sold Countryside Care Centre to Symphony Countryside, LLC (Symphony), on December 31, 2011, and had no ownership, operational interest, or financial interest in the facility during the time Michelet was a resident. Harris appeals, arguing that, after acquiring the nursing home, Symphony represented itself to the public as "Countryside Care Centre" with the knowledge and acquiescence of the Countryside defendants, thus creating an issue of fact as to whether the Countryside defendants can be held vicariously liable for Symphony's negligence under a theory of apparent agency. Pursuant to our supreme court's recent decision in *Yarbrough v. Northwestern Memorial Hospital*, 2017 IL 121367, we disagree and affirm.

¶ 3 BACKGROUND

¶ 4 Prior to December 31, 2011, Countryside Care Centre, Inc., managed Countryside Care, LLC, which operated Countryside Care Centre, a nursing home in Aurora, Illinois. On December 31, 2011, Countryside Care, LLC, entered into an "Operations Transfer Agreement" to transfer operation of the home to Symphony, as well as rights to the home's name, website, and telephone numbers. The agreement provided that Countryside Care, LLC, would terminate the home's employees, and Symphony had sole discretion regarding rehiring. The agreement also included a disclaimer stating: "Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto."

¶ 5 The operational transfer is reflected in three Illinois Department of Public Health (IDPH) forms. First, on November 30, 2011, Symphony submitted an "Application for Licensure" to the IDPH, requesting to be licensed as the operator of the nursing home. Second, on January 10, 2012, the IDPH issued a form titled "Approved Licensure Actions" in which it approved Symphony's application. Symphony's effective date of ownership is listed as December 31, 2011, and its effective date of licensure is January 10, 2012. Finally, the IDPH issued an "Illinois Department of Public Health Initial & Change of Ownership Application Checklist," dated January 10, 2012, which lists Symphony as operator/licensee.

¶ 6 After the transfer, the Countryside defendants did not retain any management or financial interest in the nursing home, according to Shael Bellows, the president of Countryside Care Centre, Inc. The Countryside defendants had no employees at the home nor did they have any responsibility or role in the care and treatment of residents. But Symphony continued to

operate the nursing home under the name "Countryside Care Centre" at all relevant times.[1] The facility name was on the front of the building, on shirts worn by nursing home staff, on internal medical records and bills sent to patients, and on the home's Facebook page and website.

¶ 7 On April 16, 2014, 74-year-old Michelet experienced shortness of breath and chest pains and was admitted to Presence Mercy Medical Center (Presence Mercy), where she was diagnosed with congestive heart failure. Her treating physician, Dr. Siddiqui, recommended that she receive pulmonary rehabilitation at a nursing home. Hospital records reflect that Michelet was "initially resistant" to the idea but eventually agreed to be placed at Countryside Care Centre, to which she was admitted on April 21. Two months later, on June 21, Michelet was discharged from Countryside Care Centre with open wounds, rashes, blisters, infections, and sores on various parts of her body. She thereafter developed sepsis, went into septic shock, and died on June 29.

¶ 8 On June 17, 2016, Harris brought suit against the Countryside defendants (and Presence Mercy, which is not involved in this appeal), alleging, in relevant part, that the Countryside defendants neglected Michelet's care in violation of the Nursing Home Care Act (210 ILCS 45/1-101 *et seq.* (West 2014)). He did not initially name Symphony as a defendant.

¶ 9 The Countryside defendants moved to dismiss based on the fact that they sold the nursing home to Symphony in 2011. Before the trial court could rule on the motion,[2] Harris amended his complaint to add Symphony as a defendant. He also alleged that the Countryside defendants were "agents, employees, apparent agents, and/or joint venturers" of Symphony and vice versa. More specifically, he alleged that the Countryside defendants were engaged in a joint venture with Symphony to share profits from the nursing home.

¶ 10 The Countryside defendants then moved for summary judgment, asserting that after transferring the nursing home to Symphony in 2011, they had no responsibility or role in the care and treatment of residents nor did they have any financial or business interest in the home. In support, they attached Bellows's affidavit, the operations transfer agreement with Symphony, and the IDPH forms reflecting Symphony's licensure as the operator of the facility, effective January 10, 2012. The Countryside defendants also asserted that the IDPH forms were "readily obtainable by any party" and the transfer was, therefore, a matter of public record.

¶ 11 In his response, Harris effectively conceded that there was no evidence of a joint venture or actual agency relationship between Symphony and the Countryside defendants. But he argued there was still an issue of fact as to apparent agency since (i) Symphony, by operating the nursing home under the name "Countryside Care Centre," held itself out as an agent of the Countryside defendants; (ii) in doing so, Symphony acted with the knowledge and acquiescence of the Countryside defendants; and (iii) Michelet relied on that "holding out" in choosing to be admitted to the facility. Thus, Harris argued, even in the absence of any actual agency, the Countryside defendants could be held vicariously liable for Symphony's medical negligence in treating Michelet.

---

[1]In February 2016, a few months before this lawsuit was filed, Symphony changed the home's name to "Symphony of Orchard Valley."

[2]In fact, it appears the motion to dismiss was never explicitly ruled on.

¶ 12	In support of his "holding out" argument, Harris attached copies of various websites. First, he attached a December 2014 printout of the Countryside Care Centre website, located at http://www.countrysidecare.com. Although the home is consistently referred to as "Countryside Care Centre," the first sentence of the "About Us" page states: "Countryside Care Centre is a proud member of Symphony Post Acute Network." Additionally, at the bottom of each page is the text "A MEMBER OF THE SYMPHONY POST ACUTE NETWORK."

¶ 13	Second, Harris attached printouts from the IDPH online database of nursing homes in Illinois, reflecting that the facility's name was "Countryside Care Centre" in July 2015. Notably, he did not include the "Ownership Information" page, which displays the licensee name for the facility. See *Nursing Homes in Illinois*, Ill. Dep't of Pub. Health, https://ltc.dph. illinois.gov/webapp/LTCApp/ltc.jsp (last visited Mar. 5, 2019) [https://perma.cc/FGE5-BMWS] (select any facility name, then click "Ownership Information").

¶ 14	On December 14, 2017, the trial court granted summary judgment in favor of the Countryside defendants. The court explained that allowing a successor owner to continue to use a business's trade name was insufficient to constitute "holding out" the subsequent owner as an agent. Otherwise, the court stated, "[n]o business would ever feel safe allowing a subsequent company to use a trade name [after] selling a company." The court also found that Harris had not established that Michelet relied on any "holding out" when choosing to be admitted to Countryside Care Centre. Finally, the court found that there was no just reason to delay enforcement or appeal under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). This timely appeal followed.

¶ 15	ANALYSIS

¶ 16	Harris argues, as he did in the trial court, that there is an issue of fact as to whether Symphony was the apparent agent of the Countryside defendants, which would subject them to vicarious liability for Symphony's alleged negligence.

¶ 17	Agency is a fiduciary relationship in which the principal controls the agent's conduct and the agent has authority to act on the principal's behalf. *Zahl v. Krupa*, 365 Ill. App. 3d 653, 660 (2006). An agent's authority can be either actual or apparent. *Id.* Here, it is undisputed that Symphony had no actual authority to act on behalf of the Countryside defendants, who retained no control over the management or operation of the nursing home after December 31, 2011. Nevertheless, under the doctrine of apparent authority, "[a] principal will be bound not only by that authority which he actually gives to another, but also by the authority that he appears to give." *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523 (1993); see also *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 35. This doctrine is based upon principles of estoppel since " 'if a principal creates the appearance that someone is his agent, he should not then be permitted to deny the agency if an innocent third party reasonably relies on the apparent agency and is harmed as a result.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 187 (2006) (quoting *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 213 (1996)).

¶ 18	Our supreme court first applied the apparent authority doctrine in a medical malpractice context in *Gilbert*, 156 Ill. 2d 511, the main case on which Harris relies. Gilbert went to a hospital emergency room suffering from pain in his chest and left arm. A physician prescribed pain medications and discharged him. Later that evening, Gilbert died as a result of a

myocardial infarction. *Id.* at 517. Gilbert's estate brought suit against the hospital, which obtained summary judgment on grounds that the physician was an independent contractor for whose actions the hospital could not be vicariously liable. *Id.* at 516-17. Our supreme court reversed, finding an issue of fact as to whether the physician was the hospital's apparent agent. *Id.* at 517.

¶ 19    *Gilbert* based its decision on two "realities of modern hospital care." *Id.* at 520. First, " 'hospitals have become big business, competing with each other for health care dollars.' " *Id.* (quoting *Kashishian v. Port*, 481 N.W.2d 277, 282 (Wis. 1992)). As part of this competition, hospitals hold themselves out to the public as providers of quality health care, inducing patients to seek emergency room services from which the hospitals benefit. *Id.* Second, it is natural for patients to assume (correctly or not) that emergency room physicians are hospital employees. *Id.* at 521. " 'Absent a situation where the patient is directed by his own physician or where the patient makes an independent selection as to which physicians he will use while there, it is the reputation of the hospital itself upon which he would rely.' " *Id.* (quoting *Arthur v. St. Peters Hospital*, 405 A.2d 443, 447 (N.J. Super. Ct. Law Div. 1979)).

¶ 20    Thus, *Gilbert* held that a hospital may be vicariously liable for the acts of its independent-contractor physicians under principles of apparent authority. "[I]t is settled that an apparent agency gives rise to tort liability where the injury would not have occurred but for the injured party's justifiable reliance on the apparent agency." *Id.* at 524. Specifically, in the hospital context:

> " 'For a hospital to be liable under the doctrine of apparent authority, a plaintiff must show that: (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' " *Id.* at 525 (quoting *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 856 (Wis. 1988)).

But the court also cautioned that "[i]f a patient knows, or should have known, that the treating physician is an independent contractor, then the hospital will not be liable." *Id.* at 522.

¶ 21    Although our supreme court has reaffirmed *Gilbert* on multiple occasions (see *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 33 (1999) (HMO may be held vicariously liable for the negligence of its independent-contractor physicians under doctrine of apparent authority); *York*, 222 Ill. 2d at 195 (plaintiff presented sufficient evidence of apparent authority to support verdict finding hospital vicariously liable for malpractice of independent-contractor anesthesiologist)), the court also recently limited *Gilbert* in *Yarbrough*, 2017 IL 121367, the facts of which are notably similar to the present case.

¶ 22    Yarbrough received prenatal care at the Erie Family Health Center. Erie staff members told her that she would likely deliver her baby at Northwestern Memorial Hospital (NMH) and gave her informational materials about NMH's facilities and services. As a result, Yarbrough incorrectly believed Erie and NMH to be the same entity. *Id.* ¶ 6.

¶ 23    After delivering her baby prematurely, Yarbrough brought a medical negligence suit against NMH, alleging that Erie's employees, as the apparent agents of NMH, were negligent in providing prenatal care. *Id.* ¶ 11. NMH moved for summary judgment on grounds that it neither owned nor operated Erie. The trial court certified a question to our supreme court: "Can

a hospital be held vicariously liable under the doctrine of apparent agency set forth in [*Gilbert*] and its progeny for the acts of the employees of an unrelated, independent clinic that is not a party to the present litigation?" *Id.* ¶ 1.

¶ 24 Our supreme court answered this question in the negative, finding that Yarbrough's situation did not implicate the policy considerations that informed *Gilbert*, *Petrovich*, and *York*. *Id.* ¶¶ 43, 49. The court explained:

> "Here, Yarbrough sought treatment at Erie but looks to impose liability on NMH. Erie is neither owned nor operated by NMH. While Erie receives some charitable financial and technical assistance from NMH, Erie is [a federally qualified health center] that relies heavily on federal grants and Medicaid reimbursement to provide underserved communities with primary and preventative care regardless of an individual's ability to pay. *** Erie does not utilize the Northwestern name. There is no Northwestern-related branding or the use of Northwestern's trademark purple color by Erie." *Id.* ¶ 44.

Under these facts, the court stated: "We refuse to read *Gilbert* and its progeny so broadly as to impose vicarious liability under the doctrine of apparent authority on a hospital for the care given by employees of an unrelated, independently owned and operated clinic like Erie." *Id.* ¶ 47.

¶ 25 We find the present action analogous to *Yarbrough* rather than *Gilbert*. Michelet sought treatment at a facility neither owned nor operated by the Countryside defendants, but operated by Symphony, an unrelated, independent entity. Under such circumstances, there is no vicarious liability under the doctrine of apparent agency. As in *Yarbrough*, the realities of modern hospital care referenced in *Gilbert*, *Petrovich*, and *York* do not apply here. These cases rely on the premise that hospitals and HMOs are " 'big business' " (*Gilbert*, 156 Ill. 2d at 520 (quoting *Kashishian*, 481 N.W.2d at 282)), marketing themselves to people in need of medical services and thereby profiting. But after 2011, the Countryside defendants had no financial or operational interest in the home; they did not publish advertisements " 'extolling the medical virtues' " of the home (*id.* (quoting *Kashishian*, 481 N.W.2d at 282)), nor did they profit from the nursing home's operations.

¶ 26 Moreover, while a patient at a medical facility might reasonably believe the professionals working there are employees of the facility (*id.* at 521), it is not similarly reasonable to believe they are employees of a separate, independent entity. We are not persuaded by Harris's argument that such belief is made reasonable by Symphony's use of the name "Countryside Care Centre." It is common for a purchaser of a business to also purchase rights to the business's trade name and goodwill. See, *e.g.*, *Phillips v. Cox*, 261 Ill. App. 3d 78, 79 (1994) (plaintiffs bought the defendant's sign-making business along with the right to use the name "David Cox Signs"); *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 109 (1984) ("When plaintiff purchased the business ***, he purchased the good will of the business and the use of the business' name which he continued to use, continuously used, and continues to use."); *Smith v. Burkitt*, 342 Ill. App. 3d 365, 370 (2003) ("[G]oodwill is generally transferred as an incident to the sale of a business."). Harris cites no law for the proposition that, by transferring these intangible assets, the original business owner may be subjected to liability in perpetuity under a theory of apparent agency. On the contrary, it is a longstanding principle that "[t]he use of a trade name by the purchaser of the right to use same is not a representation that the purchaser is the identical person who formerly used it, but merely that he has the right to do business under that name." *Klintz v. Marx*, 205 Ill. App. 376, 377 (1917)

(abstract of opinion). As the trial judge aptly observed, under Harris's proposed expansion of *Gilbert*, no business would allow a subsequent owner to continue using the business's existing trade name for fear of liability.

¶ 27     Additionally, we observe that despite retaining the facility name, there is no evidence that Symphony ever purported to be an agent of Countryside Care Centre, *Inc.*, or Countryside Care, *LLC*. On the contrary, every page of the home's website states that it is "A MEMBER OF THE SYMPHONY POST ACUTE NETWORK."

¶ 28     Finally, it is a matter of public record that Symphony operated the nursing home for years before Michelet's admission. See *Gilbert*, 156 Ill. 2d at 522 ("If a patient knows, or should have known, that the treating physician is an independent contractor, then the hospital will not be liable."). This case is therefore distinguishable from *Gilbert*, in which patients had no way of knowing the private contractual agreements between the hospital and its physicians. *Id.* at 521. For all these reasons, we agree with the trial court that Harris did not create an issue of material fact as to the Countryside defendants' "holding out" of Symphony as an apparent agent and summary judgment for the Countryside defendants was appropriate.

¶ 29     Affirmed.