Guy RICCITELLI, M.D., Plaintiff-Appellant,

v.

Fredrik BROEKHUIZEN, M.D. and Carole Hagarty, R.N., PH.D., Defendants-Respondents, †

AURORA HEALTH CARE, INC., Sinai Samaritan Medical Center, Inc. and Alan M. Wagner, M.D., Defendants.

Court of Appeals

*No. 98–0329–FT. Submitted on briefs June 23, 1998.—Decided August 25, 1998.*

(Also reported in 585 N.W.2d 709.)

†Petition to review granted.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Mark J. Goldstein* of *Padway & Padway, Ltd.*, of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the briefs of *James E. Doyle*,

attorney general, and *David T. Flanagan*, assistant attorney general.

Amicus Curiae brief was filed by *David M. Skoglind*, of Milwaukee, for Wisconsin Academy of Trial Lawyers.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

SCHUDSON, J. Guy Riccitelli, M.D., appeals from the trial court order dismissing his action against Fredrik Broekhuizen, M.D., and Carole Hagarty, R.N., Ph.D. Dr. Riccitelli argues that the trial court erred in concluding that he was required to provide notice to Drs. Broekhuizen and Hagarty, pursuant to § 893.82, STATS. He contends that his earlier action against Dr. Broekhuizen established that when Drs. Broekhuizen and Hagarty acted to terminate him from a University of Wisconsin Medical School residency program, they did so not as employees of the University, but rather, as employees of Aurora Health Care, Inc., and Sinai Samaritan Medical Center, Inc. Thus, he contends, under equitable principles and the doctrine of "issue preclusion," Drs. Broekhuizen and Hagarty could not claim state employee status to gain the protections of § 893.82, STATS.

The Wisconsin Academy of Trial Lawyers (WATL), in an amicus curiae brief, supports some of Dr. Riccitelli's arguments but ultimately offers a different theory. WATL maintains that although Dr. Broekhuizen may have been acting as a state employee, the record establishes that he also may have been acting as an Aurora/Sinai employee and, therefore, under the "dual persona" doctrine, Dr. Riccitelli could bring an

action against Dr. Broekhuizen without complying with the notice requirements of § 893.82, STATS.[1]

We conclude that the trial court correctly determined that the record in Dr. Riccitelli's first action did not establish issue preclusion. Further, although we acknowledge the strength of Dr. Riccitelli's equitable argument, we do not resolve his appeal on that basis because, we conclude, WATL correctly argues that the dual persona doctrine allows Dr. Riccitelli to bring his second action against Dr. Broekhuizen without complying with § 893.82, STATS. We also conclude that although the record regarding Dr. Hagarty is, in one respect, less explicit than that regarding Dr. Broekhuizen, in all other respects it ineluctably leads to the conclusion that Dr. Hagarty, like Dr. Broekhuizen, was an employee or agent of both the University and Aurora/Sinai. Therefore, we reverse the order dismissing Dr. Riccitelli's claims against both Dr. Broekhuizen and Dr. Hagarty.

## I. BACKGROUND

Beginning in 1991, Dr. Riccitelli was enrolled in a four-year obstetrics and gynecology residency training program at Sinai Samaritan Medical Center in Milwaukee. Dr. Broekhuizen, a member of the University of Wisconsin Medical School faculty, was the program director; Dr. Hagarty, an Assistant Professor of Clinical Obstetrics and Gynecology at the University, was the assistant director.

The residency program existed under an "Affiliation Agreement" between the Board of Regents of the

---

[1] The WATL brief makes no reference to Dr. Hagarty but, as we will explain, although the record differs with respect to Drs. Broekhuizen and Hagarty, our conclusions are the same with respect to both.

University of Wisconsin and Aurora Health Care, Inc., the entity under which Sinai Samaritan operated.[2] Under the agreement, the University was "responsible for maintaining quality programs of undergraduate medical education and of research and for providing services to Aurora in graduate medical education."[3]

[2] The organizational structure, as alleged in Dr. Riccitelli's complaint, was:

> 2. Defendant Aurora Health Care, Inc. . . . is a Wisconsin corporation. Aurora is a provider of health care services and includes Defendant Sinai Samaritan Medical Center, Inc. and the University of Wisconsin-Madison Medical School Milwaukee Clinical Campus Obstetrics and Gynecology Residency Training Program.
> 3. Defendant Sinai Samaritan Medical Center, Inc. . . . is a Wisconsin Corporation. Sinai Samaritan operates two hospitals in the City and County of Milwaukee. . . . Sinai Samaritan's "West Campus" . . . is also the location of the University of Wisconsin-Madison Medical School Milwaukee Clinical Campus Obstetrics and Gynecology Residency Training Program.

The answer filed by Aurora/Sinai (and Dr. Alan M. Wagner), however, with respect to paragraph 2, admitted only that Aurora "is a Wisconsin corporation providing health care services and that Sinai Samaritan Medical Center, Inc. is a wholly-owned subsidiary of Aurora . . .," and denied the remaining allegations; and with respect to paragraph 3, denied that the West Campus was the location of the University Ob/Gyn residency program. The answer also "den[ies] that Aurora Health Care, Inc. is a party to any contract with plaintiff."

Throughout this opinion, we frequently use the convenient reference, "Aurora/Sinai." We do so, of course, without implying any determination of any disputed factual issue regarding the organizational structure or contractual relationships between or among the parties.

[3] In their supplemental brief responding to the Wisconsin Academy of Trial Lawyers' amicus curiae brief, the respondents distinguish undergraduate and graduate medical education. Clarifying Dr. Riccitelli's graduate status, they write:

Aurora was "responsible for managing its programs in graduate medical education and cooperating with the Medical School in research, while maintaining quality patient care and meeting the standards of hospital accrediting and licensing bodies." Although the University was "responsible for the recruitment and maintenance of sufficient numbers of quality faculty," the University's medical school departments would "consult with the President of Aurora or his designee" before making faculty appointments, and "[i]nitial and subsequent clinical and administrative assignments of the full-time faculty . . . must be jointly approved in advance of such assignments by the Dean of the Medical School and the President of Aurora or his designee, as appropriate." Further, "[e]ach faculty member assigned to Sinai Samaritan . . . must at all times be a qualified member of the medical staff of the Medical Center where assigned."

Under the agreement, the University and Aurora shared significant, overlapping authority for the program director and faculty. The University and Aurora would jointly *propose* "such physicians or professional personnel intended to act as medical directors" of programs, including the residency program involved in this case, but the president of Sinai Samaritan would have the actual authority to "appoint or terminate" the

---

A resident physician is a medical school graduate who has chosen to continue training in a particular medical specialty. Typically, such graduate medical education is primarily a matter of clinical practice in a hospital under the supervision of physicians who practice in the particular specialty. [Dr. Riccitelli] is a medical school graduate who participated in a program of graduate medical education in obstetrics and gynecology offered by Sinai Samaritan. [Dr. Riccitelli], unlike any UW medical student, entered into an employment contract with Sinai-Samaritan and was paid by Sinai-Samaritan during his participation.

directors. The medical directors "shall be responsible for the administration and supervision of clinical functions and personnel, Aurora-approved departmental budgets, records and policies . . . in conformity with the rules and standards prescribed by the [Medical] Center." Further, each medical director "is responsible to . . . the President of the Medical Center."

Although the exact financial arrangements under the affiliation agreement are not entirely clear, and although the fiscal arrangements depend on several factors, including additional "departmental and research agreements," it is undisputed that Aurora/Sinai reimbursed the University for the salaries of faculty assigned to the program.[4]

In a section titled, "Liability Protection," the agreement explicitly referred to § 893.82, STATS., and declared that the "State of Wisconsin provides liability protection . . . for faculty appointed to the Medical School on a full-time basis . . . during the time they participate in Medical School educational programs at Aurora institutions, for acts within the scope of their employment or agency." The section goes on to refer to "employment or agency" and "employees or agents" without differentiating whether faculty members are employees, agents, or both, of the University, Aurora/Sinai, or both.

Dr. Riccitelli's four-year residency was renewed annually. The February 11, 1994 letter offering Dr. Riccitelli his "appointment as a fourth year resident"

---

[4] Once again, apparently drawing a distinction between undergraduate and graduate medical education programs, the respondents, in their supplemental brief, write, "In essense, the Medical School is to bear the cost of medical student education and *Aurora is to reimburse the Medical School for the cost of graduate education programs.*" (Emphasis added.)

and detailing many of the contractual terms of his position was signed by Dr. Broekhuizen as "Chairman and Program Director" of the "Department of Obstetrics and Gynecology," and by William I. Jenkins, "President" of "Sinai Samaritan Medical Center." According to the letter, the offer was from, "The Department of Obstetrics and Gynecology . . . and Sinai Samaritan Medical Center," and was on stationery with a letterhead reading, "Sinai Samaritan Medical Center / Aurora Health Care."

According to the complaint, during his fourth year of residency, "Dr. Broekhuizen perceived a personality conflict between himself and Dr. Riccitelli" and, a few months later, the program's Resident Evaluation Committee notified Dr. Riccitelli that it had advised Dr. Broekhuizen not to certify his completion of the residency program. The next month, however, the Committee, through Dr. Broekhuizen, "notified Dr. Riccitelli that, in order to complete his residency, [he] must participate in a three month probationary period followed by a six . . . month remediation program." The complaint alleges that although Dr. Riccitelli participated in the probation/remediation program, Dr. Broekhuizen violated its terms by not affording Dr. Riccitelli the required monthly meetings and evaluations. Subsequently, according to the complaint, Dr. Broekhuizen notified Dr. Riccitelli of the Committee's decision to terminate him from the residency program.

In an action preceding the one leading to this appeal, Dr. Riccitelli challenged the anticipated termination in an action seeking compensatory and punitive damages, and an injunction. Claiming he had been denied due process, Dr. Riccitelli asserted that, as a resident, he held an academic/professional staff appointment and, therefore, was a state employee enti-

tled to the protections of § 36.15, STATS.[5] Following an evidentiary hearing, however, the trial court[6] rejected Dr. Riccitelli's theory, concluding that the residency program was "of Sinai Samaritan," not "of the University of Wisconsin Medical School," and that, as a resident, he was an employee of Aurora/Sinai, not the University. Therefore, the court concluded, because Dr. Riccitelli was not a University employee, he was not entitled to the due process protections of § 36.15.

The trial court based its conclusion, in part, on testimony that subsequently proved critical to the issue in this appeal. Dr. Broekhuizen, responding to questions from Dr. Riccitelli's counsel and the court, testified:

Q Now, doctor, you've also discussed the fact that this program is operated in conjunction with Sinai Samaritan Hospital and its rules and regulations; correct?

A I've gone farther than that. This is Sinai Samaritan's medical program. And wherever I have made decisions and communications, I've done that as a program

---

[5] Section 36.15(3), STATS., provides:

PROCEDURAL GUARANTEES. A person having an academic staff appointment for a term may be dismissed prior to the end of the appointment term only for just cause and only after due notice and hearing. A person having an academic staff appointment for an indefinite term who has attained permanent status may be dismissed only for just cause and only after due notice and hearing. In such matters the action and decision of the board, or the appropriate official authorized by the board, shall be final, subject to judicial review under ch. 227. The board shall develop procedures for notice and hearing which shall be promulgated as rules under ch. 227.

[6] The Honorable John J. DiMotto presided over this earlier action.

director right under the assumption that I'm acting on behalf of Sinai Samaritan Medical Center, not on—not in my role as U.W. faculty member.

. . . .

There is not—there is no confusion among faculty and residents about, you know, who is the residency program, what is the residency program like, and what is being asked here. There is—there might be the confusion that's being created here is by ultimate use of letterheads. And so I don't think that if one were to ask any of the private practitioners practicing at Sinai Samaritan or any of the residents and ask them is this a U.W. residency program or a Sinai Samaritan residency program that there would be any confusion. It is very well known that this is affiliated with U.W., but the program is run by Sinai Samaritan Medical Center.

The evaluation of this is being reviewed by the Sinai Samaritan Medical Education Committee, which is chaired by the Vice-President for Academic Affairs etc.

And my—as far as my Residency Program Director duties, I report to that committee and to that Vice-President, and I do not report to the Chairman of the OB-GYN Department in Madison, which is my—to whom I report for Medical School student teaching and other academics. So—

THE COURT: You're saying you wear two hats?

THE WITNESS: I want to make it absolutely clear. I wear two hats. And I wear a third hat, and that is a practicing physi-

cian. And these hats sometimes overlap, sometimes don't.

Shortly after the trial court's decision dismissing Dr. Riccitelli's first action, the Committee terminated him from the residency program. Dr. Riccitelli then filed his second action—the one leading to this appeal. He brought several claims alleging that Aurora, Sinai Samaritan, Dr. Broekhuizen, Dr. Hagarty, and Dr. Alan M. Wagner (a physician who supervised him and who, as a member of the Committee, voted to terminate him) wrongfully refused to allow his graduation from the program.[7] Dr. Riccitelli claimed that, as a result, he suffered damages including the loss of a full-time Ob/Gyn position at a Minnesota clinic, which had been offered contingent upon his completion of his residency.

Drs. Broekhuizen and Hagarty moved to dismiss, arguing that they were employees of the Board of Regents of the University of Wisconsin and, therefore,

---

[7] Only one of the counts (count five), however, alleging "intentional interference with contract/hinderance of contract," was against Drs. Broekhuizen and Hagarty.

Following dismissal of his action against Drs. Broekhuizen and Hagarty, Dr. Riccitelli filed an amended complaint renewing his previous claims and adding count six, alleging "intentional misrepresentation/fraud," against Dr. Broekhuizen. The Assistant Attorney General, representing Drs. Broekhuizen and Hagarty, promptly wrote the trial court contending that because of the dismissal of the complaint against his clients, he did "not believe that the plaintiff could, by [the amended complaint] pursue further litigation against defendants Broekhuizen or Hagarty."

This appeal does not relate to the amended complaint; it involves only the dismissal of Dr. Riccitelli's claim against Drs. Broekhuizen and Hagarty in count five of the original complaint.

that dismissal was required because Dr. Riccitelli had failed to file a notice of injury and claim as required under § 893.82, STATS.[8] The trial court,[9] treating their motion as one seeking summary judgment, agreed, concluding:

I believe it is clear that there is a jurisdictional defense that has not and cannot be controverted. The defendants alleged, without any contradiction, they were employees of the State of Wisconsin and that they were working as employees in that capacity in the course of the acts that were challenged in this complaint. The plaintiff . . . [argues] . . . that this is an issue that has already been decided by Judge DiMotto. . . . [T]his issue was not addressed by Judge DiMotto. He ruled that the plaintiff was an employee of the Sinai Samaritan program. He made certain findings of fact regarding the role of the program and the State of Wisconsin, but the

---

[8] The relevant provisions of § 893.82, STATS., provide:

**(2m)** No claimant may bring an action against a state officer, employe or agent unless the claimant complies strictly with the requirements of this section.

**(3)** Except as provided in sub. (5m) [regarding time periods for filing medical malpractice claims], no civil action or civil proceeding may be brought against any state officer, employe or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employe's or agent's duties, . . . unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employe or agent involved.

It is undisputed that Riccitelli did not comply with the requirements of § 893.82, STATS.

[9] The Honorable John A. Franke presided over the second action.

544

program is different than the people who are involved in it. And ultimately these are apples and oranges. . . . Judge DiMotto did not specifically address the issue of the employment of [Broekhuizen and Hagarty]. . . . [I]t's clear, to me, that he understood and everyone understood that they were employees of the State of Wisconsin.

His findings regarding the plaintiff were that the plaintiff was not academic staff under 36.15, that the plaintiff became and was solely an employee of the Sinai Samaritan Medical Center. But I believe it was clear throughout that some of the people involved in the program were state employees and as Judge DiMotto characterized it . . . [,] "The question that this Court has to struggle with is[, 'I]s the involvement of the University of Wisconsin Medical School faculty in this case such that the action to terminate is state action requiring compliance with Wisconsin Statutes an[d] Wisconsin Administrative Codes that have been drafted to implement state statute?[' "] He's specifically referring to "these people" as "University of Wisconsin Medical School faculty" and I don't think there's any question that that's what they were. And in a program like this, there are going to be different ways to characterize it, different ways to emphasize things. There are aspects of Sinai Samaritan here. There are aspects of the university system. And when one characterizes the program, one can characterize it in different ways. . . .

Regardless of the program, the clear act is that Broekhuizen and Hagarty were state employees. That's who employed them. And the fact that state employees may get delegated to certain tasks, the fact that other people may [con]tribute in a way that helps pay or pays their salary doesn't change the fact that they are state employee[s]. . . . They're employees of the State of Wisconsin.

Accordingly, the trial court dismissed Dr. Riccitelli's claim against Drs. Broekhuizen and Hagarty.

Dr. Riccitelli argues that Judge Franke misconstrued Judge DiMotto's decision, and that Dr. Broekhuizen's testimony and Judge DiMotto's decision in the first action preclude Drs. Broekhuizen and Hagarty from claiming the protection of § 893.82, STATS. Alternatively, Dr. Riccitelli argues that even if Drs. Broekhuizen and Hagarty were state employees, their actions terminating him were not ones "growing out of or committed in the course of the discharge of [their] duties" as state employees. *See* § 893.82(3), STATS. He maintains that, at the very least, a material factual issue exists regarding whether Drs. Broekhuizen and Hagarty were acting as state employees when they terminated him. Finally, Dr. Riccitelli argues that even if Drs. Broekhuizen and Hagarty were state employees who, under ordinary circumstances, would enjoy the protections of § 893.82, he "must be excused from the requirements of the statute to avoid a miscarriage of justice."

We conclude that, while some questions may remain regarding the exact delineation of the relationships and lines of authority between Drs. Broekhuizen and Hagarty, on the one hand, and the University and Aurora/Sinai, on the other, no *material* factual issue regarding the employment status of Drs. Broekhuizen and Hagarty remains. According to the undisputed record, they were employees and/or agents of *both* the University and Aurora/Sinai. Thus, they each had a "dual persona," which, we conclude, obviated the need for Dr. Riccitelli to comply with what otherwise would have been required by § 893.82, STATS.[10]

---

[10] Accordingly, we need not address Dr. Riccitelli's equitable argument that where a state employee, in effect, invokes his

## II. DISCUSSION

The trial court reviewed the motion to dismiss as one seeking summary judgment. Summary judgment methodology is well known and need not be repeated here. Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RULE 802.08(2), STATS. Although assisted by the trial court's analysis, we review its grant of summary judgment *de novo*. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987).

### A. Dr. Riccitelli's Arguments

Dr. Riccitelli first argues that Drs. Broekhuizen and Hagarty were not state employees as "evidenced by the decision . . . and the testimony at the hearing" in his first action. We disagree. We have reviewed the record, which includes the relevant transcript from Dr. Riccitelli's first action. Although, as we will explain, the record provides ample basis for concluding that Drs. Broekhuizen and Hagarty were not acting *solely* as state employees in the residency program, it offers no basis for concluding that they were not acting as state employees *at all*. Clearly, they were.

---

or her private-employee status in order to avoid the legal obligations he or she otherwise might have to a state employee under § 36.15, STATS., the state employee may not later invoke his or her state-employee status to gain the protection of § 893.82, STATS. We certainly do, however, understand Judge Franke's comment, "I am a little troubled by at least the appearances here that [Drs. Broekhuizen and Hagarty] are trying to have it both ways: No, we aren't [state employees]. Yes, we are."

First, the very testimony on which Dr. Riccitelli so heavily relies supports the proposition that Dr. Broekhuizen, as director of the residency program, was *both* a state employee and an Aurora/Sinai employee. Although Dr. Broekhuizen's testimony—that his "decisions and communications" were "on behalf of Sinai Samaritan" and "not in my role as U.W. faculty member"—strongly supports Dr. Riccitelli's premise, it does not unequivocally eliminate Dr. Broekhuizen's status as a state employee. His testimony that the residency program "is affiliated with U.W., but the program is run by Sinai Samaritan" could support his status as an employee of either or both. Similarly, Dr. Broekhuizen's testimony that he wears "two hats"—one for the University and another for Aurora/Sinai—and that "these hats" (as well as his third hat as a physician) "sometimes overlap, sometimes don't" establishes his status as an employee of both.

Additionally, Dr. Broekhuizen's affidavit states that from 1991 through 1995, while serving as director of the residency program, he was on the University medical school faculty and that "[a]ll acts" he "undertook with respect to the supervision, instruction and evaluation of Dr. Guy Riccitelli's participation as a resident physician" in the Ob/Gyn residency program at Sinai Samaritan "were done in the course of [his] duty as an employee of the State of Wisconsin."

The State offers compelling arguments to counter Dr. Riccitelli's contention that Dr. Broekhuizen's testimony and the trial court's decision in the first action establish that the defendant doctors were *not* state employees. First, the State correctly points out that Dr. Riccitelli's first action was premised, in part, on his theory that Dr. Broekhuizen *was* a state employee. Next, the State correctly explains that nothing in

Judge DiMotto's decision concluded otherwise. Thus, the State argues, notwithstanding Dr. Broekhuizen's testimony about his tri-hatted status, "all parties to the [first action] agreed that Dr. Broekhuizen was a State employee." Moreover, the State maintains, even accepting that Judge DiMotto's decision might have left Dr. Riccitelli in doubt, or even led Dr. Riccitelli to conclude that, as a matter of law, Dr. Broekhuizen was not a state employee, the statutory mandates provide no "exception for plaintiffs who have an honest but mistaken belief about the status of the defendant as a state employee." *Mannino v. Davenport*, 99 Wis. 2d 602, 608, 299 N.W.2d 823, 826 (1981) (discussing § 895.45, STATS., which was subsequently renumbered and is now codified as § 893.82, STATS., *see* Laws of 1979, ch. 323, § 30).

Dr. Riccitelli is simply incorrect in arguing that "[e]ssential" to the trial court's judgment in the first case "was a finding that faculty and staff of the residency program are not state employees." Although the trial court in the first case did consider Dr. Broekhuizen's employment status, and did make a factual finding regarding Aurora/Sinai's compensation of the program's faculty, it did not determine whether Dr. Broekhuizen, as program director, was an employee of the University, Aurora/Sinai, or both. Ultimately, the trial court determined the status of *the program* without having to resolve whether its faculty was employed by the University, Aurora/Sinai, or both. Most significantly—and, indeed, *essential* to the trial court's decision dismissing Dr. Riccitelli's action—the trial court determined not Dr. Broekhuizen's status, but rather, *Dr. Riccitelli's status.* Judge DiMotto explained:

[I]n signing that agreement [for participation in the residency program], for all four years [Dr. Riccitelli] became and was solely an employee of the Sinai Samaritan Medical Center.

The plaintiff . . . was not granted an appointment as academic staff under 36.15. . . .

. . . .

. . . The question that this Court has to struggle with is while Dr. Riccitelli had . . . a contractual relationship as an employee of the Sinai Samaritan Medical Center, is the involvement of the University of Wisconsin Medical School faculty in this case such that the action to terminate is state action requiring compliance with Wisconsin Statutes and Wisconsin Administrative Codes . . .? That is, do University of Wisconsin Medical School policies and procedures apply and supersede the Sinai Samaritan Medical Center . . . due process rights set forth in their house staff manuals?

This Court is satisfied that given the nature of the relationship as outlined by the Court in my findings of fact, that this is a residency program of Sinai Samaritan Medical Center. It is not a residency program of the University of Wisconsin Medical School. It is not a residency program run by the State of Wisconsin. And therefore, University of Wisconsin Medical School policies and procedures do not apply and what governs this relationship between Dr. Riccitelli and Sinai Samaritan Medical Center are the Sinai Samaritan Medical Center guidelines for discipline.

Indeed, although Dr. Riccitelli argues issue preclusion, he acknowledges in his brief to this court that Judge DiMotto merely "held that *the residency program at issue is not a state program* and is, therefore, not governed by state statute or university policies and procedures." (Emphasis added.) Thus, as Judge Franke

correctly clarified in his decision, Judge DiMotto, in the first action, determined the status of *the program* and the status of *Dr. Riccitelli,* not the status of the defendant doctors.[11]

■■

Issue preclusion prevents re-litigation of factual or legal issues "actually litigated and determined by a valid and final judgment." *Hlavinka v. Blunt, Ellis & Loewi, Inc.,* 174 Wis. 2d 381, 396, 497 N.W.2d 756, 762 (Ct. App. 1993). Here, the trial court in Dr. Riccitelli's first action addressed several related matters, but simply did not—and, to resolve his action, did not have to—make factual findings or reach legal conclusions

[11] Regarding Dr. Hagarty, Dr. Riccitelli concedes that she "was not a party" in the first action. He argues, however:

> [S]he is bound by the decision in that case. First, "identity of parties" is not required for issue preclusion to apply. Moreover, there is no reason to think that Dr. Hagarty's "employment status," as Assistant Director of the residency program, is any different than that of Dr. Broekhuizen, the Program Director.

(Citation omitted.)

The Attorney General, on behalf of Drs. Broekhuizen and Hagarty, responds:

> The appellant passes by lightly the fact that respondent Hagerty [sic] was not even a party to the 1995 litigation saying he can imagine "no reason to think" that her employee status is different from that of Dr. Broekhuizen. Respondent Hagerty [sic] has submitted a competent demonstration that all her actions relating to the residency program were undertaken pursuant to her duty as a state employee. The appellant's "no reason to think" is simply a total absence of proof.

(Citations omitted.)

As we will explain, the record confirms the Attorney General's assertion that Dr. Hagarty's actions were "undertaken pursuant to her duty as a state employee." But the record also confirms that they were undertaken *also* as an employee or agent of Aurora/Sinai.

determining whether Drs. Broekhuizen and Hagarty were acting as employees of the University, Aurora/Sinai, or both. Therefore, we, like the trial court, reject Riccitelli's argument that issue preclusion precluded summary judgment in his second action.[12]

## B. Dual Persona

While we, like the trial court, conclude that Dr. Riccitelli's issue preclusion challenges just miss the mark, we also conclude that WATL's dual persona argument is right on target. As WATL explains, the record supports the trial court's conclusion that Drs. Broekhuizen and Hagarty were state employees. If, however, they *also* were Aurora/Sinai employees, was Dr. Riccitelli required to comply with § 893.82, STATS.?

WATL, citing *Yotvat v. Roth*, 95 Wis. 2d 357, 290 N.W.2d 524 (Ct. App. 1980), *Mannino v. Davenport*, 99

---

[12] Dr. Riccitelli also argues that "the allegations against Drs. Broekhuizen and Hagarty are not regarding acts 'growing out of or committed in the course of' their job duties, but regarding malicious, tortious, and intentional conduct which interfered with [his] ability to complete his residency and obtain employment." Accordingly, he maintains that even if § 893.82, STATS., might otherwise apply, it does not in this case because his allegations "are not regarding 'acts' as that term is defined" by the statute.

It is difficult to fathom Dr. Riccitelli's argument. As Judge Franke observed, "[T]he pleadings . . . make it clear that is exactly what is alleged here, that it was in the course of their duties in connection with this program which was directly in connection with their employment that they did certain things or omitted certain things that are now the subject of this lawsuit." We need not address this argument, however, because, as we will explain, the doctors' "two-hatted" status precludes summary judgment regardless of whether the doctors' alleged acts grew out of or were committed in the course of their duties.

Wis. 2d 602, 299 N.W.2d 823 (1981), and *Renner v. Madison General Hospital*, 151 Wis. 2d 885, 447 N.W.2d 97 (Ct. App. 1989), acknowledges that § 893.82, STATS., applies to physicians who are state employees even if their status as state employees is unknown to a plaintiff. As WATL points out, however, "none of those cases dealt with the situation presented here where the defendant physician conceded under oath to employment and duties *other than those as a state employee*." After all, the fact that Dr. Broekhuizen *was* a state employee does not mean that he *was not* an Aurora/Sinai employee.

Ironically, in their supplemental brief responding to WATL, the respondents concede: "Simply stated, Dr. Broekhuizen wears the hat of a supervisor of Sinai-Samaritan resident physicians because he has been assigned to do that by his employer, the UW Medical School." Indeed, as we have explained, the record clearly establishes that, as director of the residency program, Dr. Broekhuizen wore both his University and Aurora/Sinai hats. We conclude that, under the dual persona doctrine, when Dr. Riccitelli sued him, he could doff neither hat.

Although Dr. Hagarty's status is not explicitly acknowledged in the same testimonial manner as Dr. Broekhuizen's, she never argues that her employment status was any different than his. Indeed, while her affidavit states that she "undertook" her "duties" at the residency program "as an employee of the State of Wisconsin," her description of her relationship with the University and Sinai Samaritan all but confirms that, in all ways material to the issue on appeal, her relationship with Aurora/Sinai was identical to that of Dr. Broekhuizen. Moreover, the Affiliation Agreement, as quoted above, clearly establishes the "two-hatted" sta-

tus of University faculty and administration assigned to Aurora/Sinai, without a hint of any distinction that, somehow, could carve an assistant director away from the apparent dual employment/agency status. Accordingly, we also conclude that Dr. Hagarty could doff neither hat when she was sued by Dr. Riccitelli.

As WATL explains, the dual persona doctrine has provided plaintiffs the opportunity to maintain an action that otherwise might have been blocked just inside the courtroom door. Indeed, even the immunity that otherwise might cloak an employer under the workers' compensation exclusivity provision of § 102.03(2), STATS., may give way when that employer also "possesses a second persona." *Schweiner v. Hartford Accident & Indem. Co.*, 120 Wis. 2d 344, 352, 354 N.W.2d 767, 772 (Ct. App. 1984) (internal quotation marks and quoted source omitted); *see also Melzer v. Cooper Indus., Inc.*, 177 Wis. 2d 609, 612, 503 N.W.2d 291, 293 (Ct. App. 1993).

Although Wisconsin's courts have not applied the dual persona doctrine to relieve a litigant of the notice requirements of § 893.82, STATS., our decision in *Rauch v. Officine Curioni, S.p.A.*, 179 Wis. 2d 539, 508 N.W.2d 12 (Ct. App. 1993), provides sound principles justifying such an application. In *Rauch*, once again, the issue was "whether the exclusive remedy provision of the Worker's Compensation Act" precluded an employee's claim against his employer. *Id.* at 541, 508 N.W.2d at 13. Rauch had sued several defendants including Anderson, who was the CEO and 85% stockholder of Badger, the company where Rauch worked and was injured while operating a boxmaking machine. *Id.* at 541–42, 508 N.W.2d at 13. Anderson, however, also wore several other hats. In addition to his several-layered status with Badger, Anderson was the owner of

the machine and the lessor of that machine to Badger, his own company. Anderson sought summary judgment arguing that "as CEO of Badger, he was Rauch's employer and thus was shielded from tort liability under the exclusive remedy provision of the Worker's Compensation Act." *Id.* at 542, 508 N.W.2d at 13. The trial court agreed. *Id.*

We reversed, based on the dual persona doctrine. Significantly, for purposes of the instant case, we explained:

> Anderson, personally purchasing and leasing the machine, does not escape potential tort liability simply because he *also* was an employee, majority stockholder, president, or CEO of Badger
>
> An owner/lessor may be liable for furnishing equipment that injures a user of that equipment. According to the pleadings and affidavits in this case, Anderson was the owner/lessor of the boxmaking machine that allegedly caused Rauch's injury. *Having created the legal entity separate from Badger to own and lease the machine, and having accepted the personal advantages derived from such an arrangement, Anderson cannot shed that separate legal status when it works to his disadvantage. [T]hose who create an entity in order to enjoy the advantages flowing from its existence as a separate entity cannot ask that such existence be disregarded where it works to disadvantage them.*

*Id.* at 546, 508 N.W.2d at 15 (citations and parentheses omitted; emphasis added).

Similarly, here, where Dr. Broekhuizen, by his own account, wore both his University and Aurora/Sinai hats, and where, by his own account, "these hats sometimes overlap," he held a dual persona. Where Dr. Broekhuizen, together with the

President of Aurora/Sinai, on behalf of both the University and Aurora/Sinai, provided the contractual offer on which Dr. Riccitelli bases his claims, he cannot toss either hat aside, at will. Where Dr. Hagarty acts as Dr. Broekhuizen's assistant director, and where she shares the same status under the Affiliation Agreement, she cannot avoid the logical inference that she, too, acted as the employee or agent of both the University and Aurora/Sinai. Thus, Dr. Riccitelli could sue Drs. Broekhuizen and Hagarty without complying with § 893.82, STATS.

Any lingering doubt in this regard is all but eliminated by the supreme court's decision in *Kashishian v. Port*, 167 Wis. 2d 24, 481 N.W.2d 277 (1992), in which the court held, in part, that "Kashishian's failure to timely file a notice of claim with the state pursuant to [§ 893.82(3), STATS.] mandated dismissal of Dr. Port from Mr. Kashishian's medical malpractice action." *Id.* at 49, 481 N.W.2d at 287. The facts in *Kashishian*, in some respects, correspond closely to those of the instant case. While cursory reading of the supreme court's holding on this issue might seem to refute WATL's theory, a careful reading of the entire decision establishes, at least by negative inference, that, under the dual persona doctrine, Dr. Riccitelli's claim against Drs. Broekhuizen and Hagarty survives.

Kashishian sued Mount Sinai Medical Center and Dr. Port for medical malpractice that allegedly led to the death of his wife. *Id.* at 29–30, 481 N.W.2d at 278–79. At the time of the alleged malpractice,

> Dr. Port was employed by the University Physicians Milwaukee Clinical Campus Practice Plan, Inc. (MPP), which was in turn run by the University of Wisconsin Medical School. Dr. Port's position

required him to be both a faculty member at the University of Wisconsin Medical School and to participate in the school's clinical program as Director of Nuclear Cardiology within the Cardiovascular Disease Section at Mount Sinai. The University of Wisconsin Medical School's Milwaukee Clinical Campus has been located at Mount Sinai since 1974 in accordance with affiliation agreements between the University of Wisconsin and Mount Sinai Medical Center, Inc. Pursuant to these agreements the University of Wisconsin School of Medicine's faculty and support personnel were to provide clinical, administrative and teaching services to the Milwaukee Clinical Campus located at Mount Sinai.

*Id.* at 30–31, 481 N.W.2d at 279.

The first issue was "whether Dr. Port was acting as the actual agent of Mount Sinai at the time of the alleged malpractice." *Id.* at 33, 481 N.W.2d at 280. Based on several specific factors in the relationships among Dr. Port, the University, and Mount Sinai (some of which, we note, are distinguishable from those among Drs. Broekhuizen and Hagarty, the University, and Aurora/Sinai),[13] the supreme court declared that it

[13] Although one might assume that the affiliation agreement referred to in *Kashishian v. Port,* 167 Wis. 2d 24, 31, 481 N.W.2d 277, 279 (1992), and that of the instant case were essentially the same, and while the respondents assert that "Dr. Broekhuizen's relationship to the UW Medical School and the Sinai-Samaritan Medical Center, is precisely identical to that of Dr. Steven Port some eight years earlier," the record provides no basis for concluding that the contractual or actual arrangements were the same. Indeed, we note that the Affiliation Agreement between the University and Aurora/Sinai, provides, *inter alia,* that "[f]unctional and budgetary understandings will be set forth in separate agreements between Aurora and certain clinical departments of the Medical School." Needless to say,

was "abundantly clear that Dr. Port was not a servant of Mount Sinai at the time of the alleged malpractice, but rather an independent contractor," and concluded, therefore, that, as a matter of law, Dr. Port was not acting as Mount Sinai's actual agent. *Id.* at 34, 481 N.W.2d at 280.

The last issue was whether Kashishian's failure to comply with the notice requirements required dismissal. The court summarized his position:

> Kashishian argues that he may maintain a suit against Dr. Port irrespective of the fact that he did not comply with the notice provisions for one of these three reasons; either: (1) *Dr. Port was serving a dual capacity and may be sued as an actual agent of Mount Sinai instead of in his capacity as a state employee*; or (2) Dr. Port was serving a dual capacity and may be sued as an apparent agent of Mount Sinai; or (3) because applying the notice requirements to Kashishian under the facts of this case would deny petitioner his right to due process.

*Id.* at 49–50, 481 N.W.2d at 287 (emphasis added). The court rejected Kashishian's third reason without having to "determine if knowledge of Dr. Port's status as a state employee is required for enforcement of the notice of claim statute, as Kashishian did not comply" even after he clearly had knowledge. *Id.* at 51, 481 N.W.2d at 288. The court rejected Kashishian's second reason, concluding that *even if* Dr. Port "was acting as the *apparent agent* of Mount Sinai," the "doctrine of apparent authority . . . does not change the fact that . . . Dr.

within such "functional and budgetary" arrangements can come countless variations rendering significant differences in the employment and agency status of different doctors in different programs.

Port was acting within the scope of his state employment, and does not negate the notice requirements." *Id.* at 50, 481 N.W.2d at 287.

Addressing Kashishian's first reason, however, the supreme court declared:

> *Acceptance of Kashishian's first argument requires a finding that Dr. Port was an actual agent of Mount Sinai.* We concluded in Part I of this opinion that Dr. Port was not an actual agent of Mount Sinai. Therefore, Kashishian's first argument is without merit.

*Id.* (emphasis added). In the instant case, by contrast, as we have explained, the record establishes that Drs. Broekhuizen and Hagarty were employees or "actual agent[s]" of Aurora/Sinai. That the record also establishes that Drs. Broekhuizen and Hagarty *also* were state employees in no way erases their employment or "actual agen[cy]" with Aurora/Sinai.

■

Judge Franke was correct in stating, "There was no question about employment. . . . These were State of Wisconsin employees." But that was only half the story. The undisputed factual record also establishes that these doctors were Aurora/Sinai employees or "actual agent[s]." Thus, this case casts the *Kashishian* coin to its "flip side" and all but "requires" the "[a]cceptance" of WATL's dual persona theory. *See id.* Therefore, under *Kashishian*, Dr. Riccitelli was not required to comply with the requirements of § 893.82, STATS., and, accordingly, we reverse the order dismissing his complaint against Drs. Broekhuizen and Hagarty.

*By the Court.*—Order reversed.

FINE, J. *(dissenting)*. I agree with the majority that issue preclusion does not prevent Dr. Fredrik Broekhuizen and Dr. Carole Hagarty from asserting Dr. Guy Riccitelli's failure to serve the notice of claim required by § 893.82, STATS., as a bar to his action against them. I disagree, however, with the majority's conclusion that Riccitelli's action against Broekhuizen and Hagarty may, nevertheless, proceed.

Section 893.82(2m) & (3), STATS., provides that no one may bring an action against a "state . . . employe[e] . . . for or on account of any act growing out of or committed in the course of the discharge of the . . . employe[e]'s duties" unless the person seeking to sue the state employee serves upon the attorney general a timely "written notice of a claim." There is no dispute but that Broekhuizen and Hagarty were and are state employees within the meaning of § 893.82, STATS. The only question is whether Riccitelli is suing them "for or on account of any act growing out of or committed in the course of the discharge" of their duties as state employees. The undisputed summary-judgment record persuades me that he is, and that the so-called "dual persona" doctrine does not apply.

Broekhuizen and Hagarty were in a position to participate in the release of Riccitelli from the residency program only because they were state employees—employed by the University of Wisconsin Medical School and assigned by the school to the residency program. Thus, whatever their role in Riccitelli's termination from the residency program, it grew out of, and was committed in the course of, their duties as state employees.

The majority uses the dual persona doctrine, which it imports from workers' compensation law, to allow Riccitelli to bypass the bar erected by § 893.82,

560

STATS. In each workers' compensation case upon which the majority relies, the employee was allowed to sue for injuries for which an entity other than his employer was responsible. *See Schweiner v. Hartford Accident & Indemnity Co.*, 120 Wis. 2d 344, 354 N.W.2d 767 (Ct. App. 1984) (defective machine manufactured by company before it merged with plaintiff's employer; statute made employer responsible for liabilities of merged company); *Melzer v. Cooper Industries, Inc.*, 177 Wis. 2d 609, 503 N.W.2d 291 (Ct. App. 1993) (applying *Schweiner* to temporary-employment); *Rauch v. Officine Curioni, S.p.A.*, 179 Wis. 2d 539, 508 N.W.2d 12 (Ct. App. 1993) (applying *Schweiner* to officer and majority shareholder of plaintiff's employer, where officer owned and leased to employer the machine that injured plaintiff). In each of these cases the applicable statute, § 102.29(1), STATS., preserved to an employee injured on the job the right to bring a tort action against a responsible third party, and this right survived the responsible third party's merger with the plaintiff's employer (*Schweiner* and *Melzer*) and applied even though the responsible third party also owned or managed the plaintiff's employer (*Rauch*). The critical consideration was that the acts for which the responsible parties were liable, were independent of their status as employers. Thus, as we explained in *Schweiner*:

> "An employer may become a third person, vulnerable to tort suit by an employee, if—and *only* if—he possesses a second persona *so completely independent from and unrelated* to his status as employer that by established standards the law recognizes it as a separate legal person."

120 Wis. 2d at 352, 354 N.W.2d at 772 (emphasis added) (quoting 2A A. LARSON, WORKMEN'S COMPENSATION LAW § 72.8 (1983)).

Here, although Broekhuizen and Hagarty worked for both the Medical College and, on assignment from the Medical College, the residency program, this is not enough to invoke the dual persona doctrine. Their participation in the decision to release Riccitelli from the residency program, to paraphrase § 893.82(3), STATS., grew out of and was made during the course of their state-related employment, and was not, in the words of *Schweiner*, "so completely independent from and unrelated to [their] status" as state employees to permit the dual persona doctrine to circumvent § 893.82's clear bar to Riccitelli's suit against them.[1]

I would affirm.

---

[1] In my view, the majority's reliance on a passing comment on the dual persona doctrine in *Kashishian v. Port*, 167 Wis. 2d 24, 481 N.W.2d 277 (1992), is misplaced. All *Kashishian* indicated is that there might be *some* situations where the dual persona doctrine would apply in § 893.82 cases—presumably where the state employee's alleged negligence was completely independent of and wholly unrelated to his or her employment by the state. *Id.*, 167 Wis. 2d at 49–50, 481 N.W.2d at 287.