Nancy LAMOREUX, Plaintiff-Appellant,†

v.

Dr. Stephen L. ORECK and University of
Wisconsin Medical Foundation, Inc.,
Defendants-Respondents,†

WISCONSIN PATIENTS COMPENSATION FUND, Meriter
Hospital, Inc. and Medicare, Defendants.

Court of Appeals

*No. 03–2045. Oral argument April 22, 2004.—Decided
July 15, 2004.*

2004 WI App 160

(Also reported in 686 N.W.2d 722.)

† Petition to review denied 10-19-04.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Patrick T. Tierney* and *Christopher K. Wachtler, Collins Buckley Sauntry & Haugh, P.L.L.P.*, St. Paul, Minnesota. There was oral argument by *Patrick T. Tierney*.

On behalf of the defendant-respondent, Dr. Stephen L. Oreck, the cause was submitted on the brief of *James McCambridge*, asst. attorney general, and *Peggy A. Lautenschlager*, attorney general. There was oral argument by *James McCambridge*.

On behalf of the defendant-respondent,University of Wisconsin Medical Foundation, Inc., the cause was submitted on the brief of *Steven P. Means* and *Roisin H. Bell, Michael Best & Friedrich LLP*, Madison. There was oral argument by *Steven P. Means*.

Before Vergeront, Lundsten and Higginbotham, JJ.

¶ 1. VERGERONT, J. The circuit court in this medical malpractice action concluded that, based on the undisputed facts, Dr. Steven Oreck was a state employee and was acting within the scope of his state employment when he provided the allegedly negligent care. Because no notice of claim was filed under WIS. STAT. § 893.82(3),[1] the court entered summary judgment dismissing the claim against Dr. Oreck. The court also dismissed the claim against the University of Wisconsin Medical Foundation, Inc., concluding that,

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

based on the undisputed facts, the Foundation did not have a master/servant relationship with Dr. Oreck and was not liable for his alleged negligence under the doctrine of apparent authority. Nancy Lamoreux, the plaintiff, contends on appeal that the circuit court erred because there are factual disputes entitling her to a trial against both defendants. We conclude the circuit court properly granted summary judgment and therefore affirm.

## BACKGROUND

¶ 2. The complaint alleged that Lamoreux began to receive treatment from Dr. Oreck for carpal tunnel syndrome in 1996, and that in December 2000 he performed surgery on her, negligently severing her median nerve. According to the complaint, at the time of the surgery Dr. Oreck was engaged in the private practice of medicine at the University of Wisconsin Medical Foundation, Inc., and both Dr. Oreck and the Foundation were negligent in their care and treatment of Lamoreux.[2]

¶ 3. Dr. Oreck moved for summary judgment on the ground that a notice of claim had not been filed as required by Wis. Stat. § 893.82(3) for claims against

---

[2] The complaint identified the entity at which Dr. Oreck allegedly engaged in the private practice of medicine as "UW Health/Physicians Plus Medical Group" and did not refer to the Foundation. However, the Foundation answered, stating that the complaint had used an incorrect identification. Apparently the caption was never corrected in the circuit court. However, Lamoreux's docketing statement on this appeal identifies Dr. Oreck and the Foundation as the two respondents, and the Foundation, not UW Health/Physicians Plus Medical Group, is identified as a respondent in the caption on this appeal. Lamoreux was notified that this would be the caption unless she objected, and she has not done so. We therefore consider the

state employees. Accompanying his motion was the affidavit of an assistant dean of the University of Wisconsin Medical School averring that Dr. Oreck had been an employee of the UW Medical School since February 1, 1998, initially as a clinical assistant professor in the Department of Surgery and then as clinical associate professor in the Department of Orthopedics and Rehabilitation.[3] The Foundation also moved for summary judgment on the ground that it had no vicarious liability for any act or omission of Dr. Oreck.

¶ 4. Certain of the background facts regarding the relationships among Dr. Oreck, the UW Medical School, and the Foundation are not disputed.

¶ 5. Prior to February 1, 1998, Dr. Oreck was employed by Physicians Plus Medical Group, S.C. (PPMG) and had his office at One South Park Street. He had operating privileges at Meriter Hospital, University Hospital, and at an ambulatory surgery center also located at One South Park and owned at that time in part by Meriter Hospital and in part by PPMG.

¶ 6. Effective February 1, 1998, the Foundation purchased the stock of PPMG, and on that date PPMG ceased employing physicians engaged in the clinical practice of medicine. All physicians formerly employed by PPMG, including Dr. Oreck, were offered a full faculty appointment with the UW Medical School.

---

Foundation to be the correct identification of the entity at which Dr. Oreck allegedly engaged in the private practice of medicine at the relevant time.

The complaint alleged that Meriter Hospital was also negligent, but Meriter Hospital did not file a motion for summary judgment.

[3] The undisputed evidence is that prior to January 2002, orthopedics was a division within the Department of Surgery and then became a separate department.

¶ 7. The Foundation was incorporated in 1995 as a non-profit medical education and research organization operating exclusively for the benefit of and to support the purposes and operations of the UW Medical School and the University of Wisconsin-Madison. Under a 1995 agreement between the Foundation and the UW Board of Regents, the Foundation was to assume the management of the clinical practices of UW Medical School faculty physicians and health care specialists. The preamble to the agreement stated that the UW Medical School currently received one-half of its annual operating budget from the clinical fees generated by its faculty physicians and health care specialists, with administration of the clinical practices then being managed by fourteen separate departments. The stated intent of the parties was that the Foundation manage the clinical practices in a more centralized and cost-effective manner, so that the UW Medical School could better meet its mission of teaching, research, and public service in the field of health care.

¶ 8. Under the agreement between the Foundation and the UW Board of Regents, all faculty physicians with a clinical practice employed at the time of the agreement were required to become employees of the Foundation, and all future appointments were required to contain this condition. Also as a condition of employment by the UW Medical School, all faculty physicians with a clinical practice were required to commit their income from treating patients and related services to the Foundation. The Foundation, in turn, was obligated to use that money for specified purposes, which include contributions to the UW Medical School for research and development and for compensating the physician faculty members.

¶ 9. The agreement contains three additional provisions relevant to this appeal. First, the UW Medical School "retain[ed] ultimate responsibility for the quality, timeliness, and appropriateness of medical care through its Dean, Clinical Departments, Clinical Section Chiefs, and Faculty physicians and Faculty health care specialists." Second, the agreement did "not affect the roles of [various medical school personnel in] setting criteria for Faculty hiring and promotion." Third, "in all their activities conducted by and through the Foundation, Medical School Faculty physicians . . . [were], when acting pursuant to this Agreement, acting within the scope of their employment with the State of Wisconsin."

¶ 10. Dr. Oreck's February 1, 1998 appointment letter appointed him Clinical Assistant Professor in the Department of Surgery, Division of Orthopedic Surgery, UW Medical School, "a 100% Academic Staff appointment" ending December 31, 2002. The letter specified that:

> Your duties will include the clinical care of orthopedic hand surgery patients. An essential part of these duties is working in a collegial relationship with other faculty members and the teaching and supervision of medical students and residents within the context of your clinical practice. The Medical School's missions include teaching, research and public service. You and other PPMG Division physicians will be expected to maintain current levels of participation in medical student and resident education. While the specific numbers of PPMG faculty involved in each type of teaching may vary each semester, the aggregate amount of teaching is expected to be equal to or greater than that provided by PPMG physicians in 1995 and 1996. The faculty of the clinical departments will share teaching activity in an equitable fashion as determined

809

by Medical School needs. Specifically, you may be called on to fulfill some of the following teaching roles: resident education. You and your patients (to the extent they consent) will be expected to participate in clinical research trials and protocols as appropriate. The Medical School and UWMF missions include care of indigent and the underinsured populations and you will be expected to participate in a fair share of that care as part of your service obligation.

¶ 11. With respect to compensation, the letter provided that Dr. Oreck would receive a "University Base salary" of $33,200 subject to annual adjustment under the pay plan and policies of the UW Medical School and would receive the benefits available to state employees and UW-Madison employees. Consistent with the agreement between the Foundation and the Board of Regents, the appointment letter stated that Dr. Oreck would automatically become an employee of the Foundation and all of his clinically generated income was to belong to the Foundation. The compensation he was to receive in addition to his university base and benefits was, for the first two years, to be determined according to the plan that was part of the integration agreement between PPMG and the Foundation; that integration agreement also provided a process for determining a compensation system for all Foundation physician employees, including former PPMG physicians, after the transition period.

¶ 12. After February 1, 1998, Dr. Oreck continued to have his office at One South Park and continued to have operating privileges at the same three facilities, with the ambulatory surgery center now owned in part by the Foundation rather than PPMG. For purposes of this appeal, it is undisputed that Dr. Oreck performed

the December 2000 surgery at Meriter Hospital and that there were no medical students or residents present during the surgery.

¶ 13. Lamoreux opposed both motions for summary judgment. She did not dispute that a notice of claim was not filed. However, she asserted that there were material factual disputes regarding whether Dr. Oreck was in reality a state employee and, if he was, whether he was acting within the course of his duties as a state employee at the time of the alleged negligence. She also asserted there was evidence that the Foundation was vicariously liable either under the doctrine of respondeat superior or the doctrine of apparent authority. We discuss later in this opinion the evidence Lamoreux relies on.

¶ 14. The circuit court concluded there were no factual disputes with respect to the following. No notice of claim was filed as provided in WIS. STAT. § 893.82(3). At the time Dr. Oreck provided the allegedly negligent care, he was employed by the State of Wisconsin and acting within the course of his employment. Although he had a contractual relationship with the Foundation, the Foundation did not supervise him with respect to his exercise of clinical skill and judgment in treating patients. The Foundation lacked the ability to terminate Dr. Oreck while he remained a state employee. The Foundation was not liable either under the doctrine of respondeat superior or the doctrine of apparent authority. The court therefore entered an order dismissing the complaint against both Dr. Oreck and the Foundation.

## DISCUSSION

¶ 15. Lamoreux renews on appeal her argument that there are disputed issues of fact concerning whether a notice of claim was required for Dr. Oreck

and whether the Foundation is liable under the doctrines of respondeat superior and apparent authority. Therefore, she contends, granting summary judgment is improper as to both defendants.

¶ 16. When we review a grant or denial of summary judgment, we employ the same standard as that of the trial court, and our review is de novo. *Strasser v. Transtech Mobile Fleet Serv. Inc.*, 2000 WI 87, ¶¶ 28, 30, 236 Wis. 2d 435, 613 N.W.2d 142. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). In deciding whether there are genuine issues of material fact, we view the evidence and the reasonable inferences therefrom in the manner most favorable to the opposing party. *Kraemer Bros., Inc. v. United States Fire Ins. Co.*, 89 Wis. 2d 555, 565–66, 278 N.W.2d 857 (1979).

## I. Dr. Oreck

¶ 17. WISCONSIN STAT. § 893.82(3) provides that:

> no civil action . . . may be brought against any state . . . employee . . . for or on account of any act growing out of or committed in the course of the discharge of the . . . employee's . . . duties . . . unless within 120 days of the event causing the injury . . . the claimant . . . serves upon the attorney general written notice of a claim . . . .[4]

---

[4] A different time period is provided for medical malpractice claims. WISCONSIN STAT. § 893.82(5m) states:

> **(5m)** With regard to a claim to recover damages for medical malpractice, the time periods under subs. (3) and (4) shall be 180 days after discovery of the injury or the date on which, in the

¶ 18. Lamoreux's counsel conceded at oral argument that if Dr. Oreck was acting within the course of his state employment at the time of the surgery, the statute required a notice of claim, and none was given. Counsel also acknowledged that "on paper" it appears Dr. Oreck was an employee of the state. However, Lamoreux argues, there is evidence that supports her position that Dr. Oreck was not in fact a state employee and that, even if he was, he was not acting within the course of his state employment at the time of her surgery.

A. Applicable Law

¶ 19. Before discussing the evidence Lamoreux relies on, two issues regarding the legal framework for our analysis require resolution. First, in arguing that Dr. Oreck was not a state employee in December 2000, Lamoreux relies on the test used to distinguish between an independent contractor and a servant for purposes of establishing liability on the part of another party under the doctrine of respondeat superior. Under this doctrine, a master is liable for the acts of his or her servant, and a servant is one who is "employed to perform service for another in his affairs and who, with respect to his *physical conduct* in the performance of the service, is subject to the other's control or right to control." *Pamperin v. Trinity Mem'l Hosp.*, 144 Wis. 2d 188, 198–99, 423 N.W.2d 848 (1988) (emphasis in original) (citation omitted). While the right to control is the dominant factor, there are other relevant factors, which include "the place of work, the time of the employment, the method of payment, the nature of the business or

exercise of reasonable diligence, the injury should have been discovered, rather than 120 days after the event causing the injury.

813

occupation, which party furnishes the instrumentalities or tools, the intent of the parties to the contract, and the right of summary discharge of employees." *Id.* at 199. The court in *Pamperin* applied this test to determine whether a hospital was liable for the alleged negligence of a radiologist in the emergency room. *Id.* at 194, 199–202. The court concluded that the doctor was an independent contractor, not a servant of the hospital, and the hospital therefore was not liable under the doctrine of respondeat superior. *Id.* at 199–202. Using the same test, the court reached the same result on different facts in *Kashishian v. Port,* 167 Wis. 2d 24, 33–37, 481 N.W.2d 277 (1992).

¶ 20. More recently, we have clarified that being an employee and being a servant for purposes of respondeat superior are not the same thing: an employer is not vicariously liable unless the employee is also a servant under the test established in *Pamperin. Estate of Hegarty v. Beauchaine,* 2001 WI App 300, ¶¶ 58–61, 249 Wis. 2d 142, 638 N.W.2d 355.

¶ 21. In this case, the state is not disputing that it is liable for any negligence of Dr. Oreck in treating Lamoreux. The state is representing Dr. Oreck and its position is that Dr. Oreck was an employee of the state and was acting within the course of that employment when treating Lamoreux. The state therefore acknowledges that Dr. Oreck would be entitled to an indemnity under Wis. Stat. § 895.46(1) for any judgment of liability because his acts were committed while carrying out his duties as a state employee. However, the state's brief does not respond to Lamoreux's position that Dr. Oreck was not a state employee within the meaning of Wis. Stat. § 893.82 unless he had a master/servant relationship with the state.

¶ 22. Lamoreux's position makes sense. Presumably the state does not assume liability for an individual under Wis. Stat. § 895.46(1) as a state employee unless the state has the type of control over the individual that would constitute a master/servant relationship. It is reasonable to give "state employee" in Wis. Stat. § 893.82(3) a meaning consistent with this type of control because the purposes of the notice of claim include providing the attorney general with the opportunity to investigate claims that might result in judgments against the state and to effectuate a compromise without a court proceeding. Section 893.82(1)(a)-(b). In the absence of an argument from the state to the contrary, we conclude the factors relevant to a master/servant relationship are relevant to deciding whether Dr. Oreck was a state employee.

¶ 23. The second issue is the effect of Dr. Oreck's relationship to the Foundation on his status as a state employee. In *Riccitelli v. Broekhuizen*, 227 Wis. 2d 100, 115–16, 595 N.W.2d 392 (1999), the court considered and rejected the argument that the dual persona doctrine from worker's compensation law created an exception to the requirement of a notice of claim under Wis. Stat. § 893.82(3).[5] The physician in that case was on the UW Medical School faculty and director of the residency program at Sinai Samaritan Hospital and was sued by a resident for terminating his residency. *Id.* at 107–08.

---

[5] The dual persona doctrine is an exception to the exclusive remedy provision of the Worker's Compensation Act. This doctrine applies where the employer "possesses a second persona so completely independent from and unrelated to his status as employer that by established standards the law recognizes it as a separate legal person." *Riccitelli v. Broekhuizen*, 227 Wis. 2d 100, 115–16, 595 N.W.2d 392 (1999) (citation omitted).

The residency program existed under an affiliation agreement between the Board of Regents and the corporation operating Sinai Samaritan Hospital. *Id.* at 106. This court had decided that under the affiliation agreement, the physician had apparent dual employment/agency status as UW Medical School faculty and administration assigned to the hospital, and thus there was no need to file a notice of claim. *Id.* at 115.

¶ 24. The supreme court reversed. The court reasoned that the purpose of Wis. Stat. § 893.82(3) is to enable the governmental unit to investigate a claim against an employee and avoid needless litigation, while the dual persona doctrine is part of the delicate balancing of interests in the worker's compensation laws. *Id.* at 116. For this reason, the court concluded, "Importing the dual persona doctrine to allow a party to vitiate the notice of claim provision, does not fit well with the purposes of either § 893.82(3) or the dual persona doctrine." *Id.* The court went on to say that

> [e]ven if we were to conclude that the dual persona doctrine could be applied in this case, we agree with the dissent in [the Court of Appeals decision] that the elements have not been met ... [because the physician's] participation in the decision to release [the resident] grew out of and was related to his employment with the U.W. Medical School.

*Id.* at 116–17.

██

¶ 25. We read *Riccitelli* to hold that a state employee's affiliation with another entity does not vitiate his or her status as a state employee for purposes of Wis. Stat. § 893.82(3) as long as the act sued upon "grow[s] out of or [was] committed in the course of" the

person's duties as a state employee. Section 893.82(3). Accordingly, evidence of Dr. Oreck's relationship to the Foundation supports Lamoreux's position that § 893.82(3) does not apply if it is relevant either to whether he was a state employee or to whether he was acting within the course of his duties as a state employee at the relevant time.

### B. Dr. Oreck as a State Employee

¶ 26. Lamoreux asserts the following evidence supports her position that Dr. Oreck was not an employee of the UW Medical School in December 2000: (1) the chair of the Department of Orthopedic Surgery provided only minimal supervision of Dr. Oreck's practice; (2) most of Dr. Oreck's time was spent in patient care, as it was before February 1, 1998; (3) the Foundation had a role in the recruitment of UW Medical School physicians through the joint personnel committee; (4) 80–100% of Dr. Oreck's salary was paid by the Foundation; (5) a reasonable inference from the Foundation's purchase of PPMG's stock is that the Foundation became the owner of the building in which Dr. Oreck practiced and employed the staff that supported his medical practice there; and (6) the Foundation had a malpractice policy that arguably covered Dr. Oreck. We address each point in turn.

### 1. *Supervision and Control*

¶ 27. Dr. Oreck deposed that Dr. Thomas Zdeblick, chair of the Department of Orthopedics and Rehabilitation, was his supervisor. As chair of the department, Dr. Zdeblick was responsible for the performance of all the physicians in the department and he

corrected whatever problems might arise with them. Dr. Oreck submitted to Dr. Zdeblick on an annual basis written information on his professional activities, including research and teaching. Dr. Zdeblick conducted the performance review that resulted in Dr. Oreck's promotion to clinical associate professor effective July 1, 2002, for a three-year term. Dr. Zdeblick had minimal involvement in Dr. Oreck's day-to-day treatment of his patients and did not review his (Dr. Oreck's) charts; as was true of all the medical school department chairs, Dr. Zdeblick did not have contact with the patients of the physicians in his department unless it was on a consultative basis. Dr. Oreck saw Dr. Zdeblick when the latter came to One South Park, which was every few months, and he saw him at teaching conferences ("rounds") and department meetings. In Dr. Oreck's words, Dr. Zdeblick did not have a "very hands-on supervision on a day-to-day basis of any of the physicians in the department."

¶ 28. Viewing this testimony in the light most favorable to Lamoreux, we agree with her that Dr. Zdeblick's supervision of Dr. Oreck's practice can be characterized as minimal. However, there is no dispute that Dr. Zdeblick was Dr. Oreck's supervisor, and it is undisputed that neither the Foundation nor any other entity supervised Dr. Oreck in his treatment of patients. Dr. Jeffrey Grossman, Senior Associate Dean for Clinical Affairs for the UW Medical School and CEO for the Foundation, averred that the UW Medical School, not the Foundation, supervised, directed, and controlled Dr. Oreck in the care and treatment of his patients at any clinic or facility operated by the Foundation. This is consistent with the agreement between the Foundation and the UW Board of Regents and there is no evidence to the contrary. There is also no reason-

able inference from the evidence that Dr. Oreck received less supervision than was typical for faculty physicians with clinical practices. Accordingly, the minimal supervision by Dr. Zdeblick does not create a factual dispute over whether Dr. Oreck was a state employee.

### 2. *Recruitment, Hiring, and Firing*

¶ 29. The interim administrator for the Department of Orthopedics and Rehabilitative Medicine deposed that the authority to hire and terminate faculty physicians in the department was exercised by Dr. Zdeblick as chair and by the dean of the medical school. Dr. Grossman deposed that all faculty recruitments took place through the medical school, with advice from a joint personnel committee made up of representation from the medical school, the Foundation, and UW Hospital and Clinics.

¶ 30. We do not agree with Lamoreux that the Foundation's role in recruitment based on its membership on the joint personnel committee is evidence that Dr. Oreck was not a state employee. There is no dispute that the ultimate authority to hire and terminate Dr. Oreck resided with the UW Medical School.

### 3. *Time Spent in Patient Care*

¶ 31. In his interrogatory answers, Dr. Oreck estimated that he spent 85% of his time on patient care, 1–2% on research, and 13% on teaching. At his deposition he explained that teaching and patient care overlapped, because, for example, he might take medical students or residents with him when he treated patients. Other teaching activities, he stated, included teaching upper extremity anatomy to residents and

giving lectures at orthopedic and plastic surgery rounds to medical students, residents, and occasionally, physician assistants. He did some of this teaching before February 1998, but, he stated, he did substantially more afterward, "both in scope and in total amount," and did more research afterward as well. In his deposition, Dr. Oreck also mentioned writing that he did as part of his academic work, which he had not included in his interrogatory answers.

¶ 32. Lamoreux argues that there is evidence suggesting that Dr. Oreck was doing little or no research in December 2000 and very little teaching. She relies on depositions of Foundation personnel taken in June 2001 in another action[6] to the effect that they had no knowledge of clinical research trials at One South Park other than those in certain specialties that did not include orthopedic surgery, and they did not specifically know at which of the sixteen clinics owned by the Foundation education of medical students and residents took place.

¶ 33. We do not agree with Lamoreux that the lack of knowledge by Foundation personnel creates a genuine dispute as to whether Dr. Oreck conducted any research after February 1, 1998, or engaged in any teaching, in view of Dr. Oreck's specific testimony that he was doing both. We do agree that there are factual disputes concerning the precise amount of time Dr. Oreck devoted to educating medical students and residents and to research both before and after February 1, 1998, but we conclude these are not material. It is

---

[6] The other action was *University of Wisconsin Med. Found., Inc. v. City of Madison*, 2003 WI App 204, 267 Wis. 2d 504, 671 N.W.2d 292. We held there that the Foundation did not qualify for property tax exemptions under Wis. Stat. § 70.11(4) and (25). *Id.*, ¶¶ 32, 35.

undisputed that the great majority of Dr. Oreck's time both before and after February 1, 1998, was spent on patient care, that teaching occupied significantly less of his time, and that the amount of time he spent on research even by his own account was relatively small. The question, then, is whether this creates a factual dispute over whether he was a state employee. We conclude it does not. Dr. Oreck's appointment letter included in his duties "the clinical care of orthopedic hand surgery patients . . . and the teaching and supervision of medical students and residents within the context of your clinical practice." There is no basis in the record for inferring an inconsistency between Dr. Oreck devoting the great majority of his time to his clinical practice and being a state employee.

¶ 34. It may be that Lamoreux is suggesting that the UW Medical School was acting outside its authority in defining Dr. Oreck's duties as a state employee to include carrying on the same clinical practice he had before. She may also be suggesting that the benefit to the state was not adequate to make Dr. Oreck a state employee unless he performed more teaching or research. If so, these are legal arguments that Lamoreux has not developed. She has brought to our attention no authority to support an argument that the UW Medical School was acting outside its authority in appointing Dr. Oreck to a full-time faculty position on the terms that it did.

### 4. *Compensation*

¶ 35. There is no dispute that Dr. Oreck received checks from two entities: the UW Medical School and the Foundation. He also received from the state the benefits available to state employees and UW-Madison employees, and he received additional benefits from the

Foundation. In his deposition Dr. Oreck estimated that the amount he received from the UW Medical School for his university base was about 20–25% of the total compensation he received from both sources.

¶ 36. The undisputed evidence is that the money generated by the faculty physicians from their clinical practices went to the Foundation, which used some of that money to cover the Foundation's expenses, gave some of that money to the Medical School Development Fund for the dean's discretionary use, and the remaining amount was divided among the fifteen departments in the medical school. Each department decided how much should go to department operating expenses, how much to research and development at the department level, and how much to physician compensation above the university base, with that compensation coming in the form of a check from the Foundation. Although the departments each made these decisions, the Foundation had various committees that provided certain guidelines.

¶ 37. There is also evidence that the university base salary did not necessarily correlate to the percentage of time devoted to academic as opposed to clinical activities and did not necessarily come solely from state taxpayer funds; it might include funds from the Foundation, which are generated by the faculty physicians, and from the federal government. Lamoreux relies on this evidence to argue that anywhere from 80–100% of Dr. Oreck's compensation was provided by the Foundation.

¶ 38. Again, while we agree there are factual disputes over the precise formula for Dr. Oreck's compensation and the percentage, if any, that was from state taxpayer funds, these are not material to the issue of whether Dr. Oreck was a state employee. There is no

dispute that most if not all of the compensation Dr. Oreck received from both the UW Medical School and the Foundation was ultimately generated by his own clinical practice, the fees from which he was obligated by his letter of appointment to commit to the Foundation. In essence, rather than have the various UW Medical School departments collect the fees generated by the practicing physicians, deduct operating expenses, and set aside money for research and development and other needs before paying the physicians from the remainder, the Foundation performed these functions under contract with the state—the UW Board of Regents. This is the only sense in which the Foundation was "providing" 80–100% of Dr. Oreck's compensation, and we conclude it is not evidence that Dr. Oreck was not a state employee.

### 5. *Building and Support Staff*

¶ 39. We agree with Lamoreux that it is a reasonable inference from the record that the Foundation owned the building at One South Park and employed the support staff that assisted Dr. Oreck in his practice there. We do not agree, however, that this creates a factual dispute over whether he was an employee of the state. There is no basis in the record for inferring, and no legal authority for concluding, that a state employee must perform his or her duties in a building owned by the state and with support staff who are also state employees.

### 6. *Foundation's Malpractice Policy*

¶ 40. The Foundation had an "Entity Professional Liability Occurrence" policy that provided coverage for the individual liability of employees for whom the Foundation was "legally responsible." "Employee" was

defined as an individual employed by the Foundation "while he or she is providing professional health care services within the scope of that employment . . . . Employee does not include any individual who is required by state statute or regulation to maintain separate limits of coverage for professional health care services."

¶ 41. The Foundation's position is that this policy did not cover Dr. Oreck because the health care services he provided were not within the scope of his employment by the Foundation and, even if that were not so, he was not an employee within the definition of the policy because he was required under WIS. STAT. ch. 655 to maintain statutory limits of malpractice coverage.[7] Lamoreux asserts that this policy "arguably" covered Dr. Oreck. However, she concedes that resolution of the issue of whether there was coverage requires a resolution of whether Dr. Oreck was acting within the scope of his employment by the Foundation in performing surgery on Lamoreux. We conclude that the existence of the policy itself is not evidence that Dr. Oreck was not a state employee, and therefore it does not create a factual dispute over whether he was one.

7. *References to "Physicians Plus"*

¶ 42. Lamoreux submitted an affidavit to which she attached various documents related to her surgery including billing statements, patient information, and patient consent forms that referred to either "Physicians Plus Medical Group" or to "UW Health/Physicians Plus." We are unclear whether she is arguing that this is evidence that Dr. Oreck was not a state employee in December 2000, or this is evidence that she did not know

---

[7] WISCONSIN STAT. § 655.23(3)(a) requires health care providers who do not opt and qualify for self-insurance to insure their liability by a policy of health care liability insurance.

he was a state employee. We therefore address each point.

¶ 43. It is undisputed that after February 1, 1998, Physicians Plus Medical Group, S.C. did not employ physicians and, according to a search of corporate registrations submitted by Lamoreux, that corporation was dissolved on December 31, 1999. There is no evidence that any other entity containing the name "Physicians Plus" employed Dr. Oreck after February 1, 1998. We conclude that the use of forms in connection with Lamoreux's surgery that contained the name either "Physicians Plus Medical Group" or "UW/Physicians Plus" does not create a factual dispute whether Dr. Oreck was a state employee in December 2000.

▮

¶ 44. As for whether Lamoreux had actual knowledge that Dr. Oreck was a state employee in December 2000, the court has held in *Mannino v. Davenport*, 99 Wis. 2d 602, 608, 299 N.W.2d 823 (1981), that Wis. Stat. § 893.82(3) "does not create an exception for plaintiffs who have an honest but mistaken belief about the status of the defendant as a state employee." *See also Renner v. Madison Gen. Hosp.*, 151 Wis. 2d 885, 891, 447 N.W.2d 97 (Ct. App. 1989). The court in *Mannino* acknowledged that the statute may "produce harsh consequences," and "recommend[ed] that the legislature examine the possibility of attaining these objectives through less drastic means." *Mannino*, 99 Wis. 2d at 615–16. But the legislature has not modified the statute to address the situation of a plaintiff with an honest but mistaken belief that a physician is not a state employee.[8]

---

[8] Although *Mannino* resolves this issue against Lamoreux, we observe that there is evidence in the form of Dr. Grossman's

C. In the Course of Dr. Oreck's Duties as a State Employee

¶ 45. Lamoreux argues that there are factual disputes concerning whether Dr. Oreck's alleged negligence was committed in the course of his duties as a state employee because there is no evidence he was teaching in connection with her surgery and no evidence the treatment he provided Lamoreux was part of research. In addition, she relies on much of the evidence that formed the basis for her argument that he was not a state employee—the similarity of what he did after February 1, 1998, to what he did before, the proportion of his time spent on patient care as compared to teaching and research, and the source of his compensation.

¶ 46. We conclude that the lack of teaching or research accompanying Dr. Oreck's treatment of Lamoreux is not evidence that he was not acting within the course of his duties as a state employee in treating her. As we have already explained, his duties were defined in his appointment letter to include the clinical care of hand surgery patients. There is no suggestion in this letter or any other evidence that his duties were defined to include clinical care of patients only when he was

affidavit that very soon after February 1, 1998, signage was changed within and outside the buildings to identify the former PPMG sites as either "UW Health" or "UW Physicians Plus," and name tags, stationary, etc., were also changed to use either of these names. He averred that "Physicians Plus" when used "was subordinated by placement or size." These averments are consistent with the documents that Lamoreux provided, except that her patient registration form was titled "Physicians Plus Medical Group Patient Registration."

teaching or conducting research with respect to the care to a particular patient. There is no dispute that the alleged negligent acts grew out of Dr. Oreck providing clinical care to a hand surgery patient and that providing that care was included within his duties as defined in his appointment letter.

¶ 47. Lamoreux relies on the discussion in *Mannino* in which the court concluded that, based on the undisputed facts, the physician there was a state employee. In that context, the court stated: "[e]ven if a faculty member treated a patient and thereafter directly or indirectly received remuneration from that person, such treatment was part of the instructor's educational tasks in that it was done with the understanding that residents would observe and assist in the treatment." 99 Wis. 2d at 608. The court in this passage is summarizing the evidence supporting that particular physician's status as a state employee; the court is not establishing a rule that teaching is necessary for a faculty physician to be acting in the course of state employment.

¶ 48. Lamoreux also points to the evidence indicating that 925 physicians are in Dr. Oreck's situation —considered as state employees by the state when they are providing clinical services. She argues that it is unfair to patients of those physicians with malpractice claims to be subject to the short time period for filing a notice of claim and the cap of $250,000 in Wis. Stat. § 893.82(6). At oral argument Lamoreux's counsel described the state as attempting to "sell[] limited liability in exchange for money" and asserted that this should not be allowed because it is unfair of the state to limit the compensation to injured patients in this way.

¶ 49. We do not agree with Lamoreux's characterization of "selling limited liability." We agree there is a

reasonable inference from the record that physicians in Dr. Oreck's situation benefit from not having to pay malpractice premiums and that, while the state in essence becomes their insurer, its liability is significantly limited—directly by the cap and indirectly by the notice of claim statute. It is also reasonable to infer that some number of injured patients of these physicians will receive no compensation or less compensation because of the status of these physicians as state employees. Lamoreux's argument that this is unfair is in essence a policy argument that must be addressed to the legislature. We see nothing in Wis. STAT. § 893.82(3), the case law construing it, or any other authority brought to our attention that would permit this court to dispense with the notice of claim requirement for the reasons Lamoreux advances.

D. Conclusion

¶ 50. We conclude that, based on the undisputed facts, Dr. Oreck was a state employee on December 19, 2000. The agreement between the Foundation and the UW Board of Regents, Dr. Oreck's appointment letter, Dr. Oreck's testimony, and the averments and testimony of UW Medical School personnel and Foundation personnel all establish his status as a state employee. There is no evidence to the contrary that creates a material factual dispute. We also conclude there is no dispute that the alleged negligent acts were performed within the course of Dr. Oreck's duties as a state employee. Accordingly, because Lamoreux did not file a notice of claim as required by Wis. STAT. § 893.82(3), the circuit court properly dismissed the claim against Dr. Oreck.

## II. The Foundation

### A. Respondeat Superior

¶ 51. Although we have already indirectly addressed the existence of a master/servant relationship between Dr. Oreck and the Foundation, we directly address it now. Viewing the evidence most favorably to Lamoreux, there is no evidence or reasonable inferences from the evidence that Dr. Oreck was subject to the control or the right to control of the Foundation in exercising his clinical skills and judgment in the treatment of his patients, including Lamoreux. Because this is the dominant element of a master/servant relationship, we conclude the Foundation is entitled to judgment as a matter of law that it is not liable for Dr. Oreck's alleged negligence under the doctrine of respondeat superior.[9]

### B. Apparent Authority

¶ 52. Lamoreux argues that, even if the Foundation is not liable under the doctrine of respondeat superior, there is evidence that supports liability under the doctrine of apparent authority. Under this doctrine "a principal may be held liable for the acts of one who reasonably appears to a third person, through acts by the principal or acts by the agent if the principal had knowledge of those acts and acquiesced in them, to be

---

[9] Because of this conclusion, it is unnecessary to address the Foundation's argument that, even if it was Dr. Oreck's master, it is not liable because Dr. Oreck had the status as a "borrowed employee" of the state when providing care and treatment to Lamoreux.

authorized to act as an agent for the principal." *Pamperin*, 144 Wis. 2d at 203. The three necessary elements are: (1) acts by the agent or principal justifying belief in the agency; (2) knowledge thereof by the party sought to be held; and (3) reliance thereon by the plaintiff consistent with ordinary care and prudence. *Id.* The court in *Pamperin* held that under this doctrine a hospital may be liable for the acts of emergency room physicians retained by the hospital as independent contractors, unless the patient knew or should have known that the doctor was an independent contractor. *Id.* at 207. In *Kashishian*, the court held this doctrine may be applied to hold hospitals liable for the negligent acts of independent contractor physicians in a non-emergency room context. 167 Wis. 2d at 45–47.

¶ 53. Lamoreux argues the following evidence shows the Foundation is liable under the doctrine of apparent authority: she originally sought care from "UWMF [the Foundation]/Physicians Plus;" Dr. Oreck always represented himself to her as affiliated with Physicians Plus; and this continued to be true at the time of her surgery. Therefore, she asserts, there are disputed issues of fact concerning the Foundation's liability under the doctrine of apparent authority.

¶ 54. We do not agree either with Lamoreux's characterization of the evidence or her legal analysis. It is undisputed that the Foundation was not in existence when Lamoreux originally received care from Dr. Oreck in 1996 and that PPMG ceased existence before the surgery occurred.[10] There is no evidence that Lamoreux

---

[10] If Lamoreux intends to argue that the Foundation is liable under the doctrine of apparent authority because of acts of either Dr. Oreck or PPMG that she relied on before PPMG

ever knew of the existence of the Foundation before her surgery. Framed in the context of this case, there must be evidence that either the Foundation or Dr. Oreck acted in a way that justified Lamoreux's reasonable reliance on Dr. Oreck being an agent of the Foundation. Viewing the evidence and all reasonable inferences in the light most favorable to Lamoreux, we conclude there is no evidence of this.

C. Conclusion

¶ 55. Because the undisputed evidence shows that the Foundation is not liable for the alleged negligent acts of Dr. Oreck under either the doctrine of respondeat superior or the doctrine of apparent authority, we conclude the circuit court properly dismissed the claim against the Foundation.

*By the Court.*—Judgment affirmed.

ceased existence, she has not developed that argument nor presented evidence regarding what she relied on in initially choosing Dr. Oreck as her physician.